BURNETT SMITH, RESPONDENT, v. JAMES Y. SIMPSON, ET AL., APPEL-
LANTS.*

Kansas City Court of Appeals.  May 3, 1926.

*Corpus Juris-Cyc References: Damages, 17CJ, p. 1333, n. 81; Evidence, 22CJ, p. 905, n. 48; Hospitals, 30CJ, p. 467, n. 15, 17; p. 470, n. 4.

*Langworthy, Spencer & Terrell* for appellant.

*Harry G. Kyle* and *T. N. Haynes* for respondent.

ARNOLD, J.—This is an action in damages for the death of plaintiff's wife caused by the alleged negligence of defendants and their servants.

Defendants, who are physicians, are co-partners, owning and conducting a private sanitarium for gain in Kansas City, Mo., employ-

ing nurses and other servants for the treatment and care of patients accepted and received by defendants for treatment for nervous, mental and other kindred ailments. Plaintiff is a farmer and, with his wife and their small son, lived on a farm near Pleasant Hill, Cass county, Mo.

The record shows that for several months prior to June, 1923, plaintiff's wife had been suffering from some nervous or mental disorders and in May, 1923, she underwent a surgical operation at the Christian Church Hospital in Kansas City, Mo. About the middle of June, she still was suffering from such disorders and was taken by her husband to defendants' sanitarium, where an interview took place with defendant Doctor Major, relative to placing plaintiff's wife in the sanitarium. There were present on this occasion besides plaintiff and his wife and Dr. Major, plaintiff's father-in-law, Robert Jackson, the young son of plaintiff and his wife, Robert L. Smith, and Dr. S. G. Burnett, a physician who had been consulted by plaintiff and his wife.

Testimony on behalf of plaintiff tends to show that Dr. Major there asked plaintiff's wife if she had ever had any desire to take her own life, to which she replied:

. "Yes, I have, while I was in the Christian Church Hospital. I went to the window two different times to jump out, but Robert Lee (her son) would come before me, I would think of the boy and could not do it."

It is shown in plaintiff's evidence that Dr. Major, in conversation with plaintiff, not in the presence of the latter's wife, but in the presence of the said Robert Jackson, told plaintiff that, as his wife contemplated suicide, he would not take her under any circumstances as a patient in the sanitarium, unless plaintiff would consent that she be locked up where it would be impossible for her to take her own life; that Dr. Major then told plaintiff that a nurse would watch his wife at all times; that the charges would be $150 per month in advance and that it would take from two to three months to effect a cure; that Dr. Major showed plaintiff the room in which his wife would be placed, which was on the second floor, in what was known and designated as the mental ward, having barred windows.

Dr. Major, during the preliminary conversation, told plaintiff of his experience in diagnosing and treating mental diseases, and of his proficiency in this line; that plaintiff's wife would be cured by the treatment and care which would be given her in the sanitarium. Plaintiff thereupon placed his wife in the care of defendants and she was put in the mental ward of the institution.

The testimony of Dr. Major as to what occurred at the first interview with plaintiff, preliminary to the acceptance of plaintiff's wife as a patient, was somewhat contradictory of that in behalf of plain-

tiff. The doctor testified that he made an examination of plaintiff's wife on that occasion in the presence of Dr. Burnett; that he did not ask Mrs. Smith if she had ever contemplated taking her own life; that information as to suicidal tendencies ordinarily is obtained from indirect questioning and not by asking the patient the direct question; that Mrs. Smith, in response to his indirect questions always stated she wanted to get well; that she never mentioned her thought to commit suicide while at the Christian Church Hospital; that plaintiff was told that Mrs. Smith would be placed in the mental ward until a more thorough examination could be made; that on the following day a more thorough examination was made and the patient transferred to the ward used for nervous patients; that defendants were convinced she was not suffering from mental trouble.

Plaintiff, in company with his son Robert, went to the sanitarium to see his wife every Sunday and on each occasion, according to his testimony, was told she was improving. In August, 1923, after Mrs. Smith had been in the sanitarium for two months, plaintiff, with the consent of Dr. Simpson who was in charge during the temporary absence of Dr. Major, took his wife to their home for a week, Dr. Simpson stating that the visit would do her no harm but that she would not want to return to the sanitarium. While plaintiff's wife was at home, she grabbed a bottle of verinal tablets and said she would take them all, but was prevented from so doing by plaintiff and their son. Upon Mrs. Smith's return to the sanitarium at the end of her week's visit, Dr. Simpson who was still in charge was told of the incident of the tablets and stated that by reason thereof he would have to put her back in the mental ward. Plaintiff paid defendants for another month's care for his wife and she was again placed in the mental ward where she remained until the 12th day of September, 1923, on which date she committed suicide by hanging herself from an elbow of a steam pipe, by the use of bed sheets.

It is in evidence that Mrs. Smith was afflicted with nervous and mental troubles, characterized by Dr. Harold Jerrard, her family physician and a general practitioner, as melancholia. She was excessively nervous and low-spirited most of the time. It is also in evidence that while Mrs. Smith was in defendants' sanitarium, she was very nervous, most of the time, depressed, low-spirited, crying, worrying and complaining of pains in her head, so that it was necessary to administer opiates to her daily.

About 11 o'clock P. M. on September 11, Mrs. Smith was worrying about her contemplated return to her home. This fact is testified to by defendants' witness, Mrs. Pearson, an employee of the sanitarium, who described the last conversation anyone had with Mrs. Smith, so far as shown by the record.

As stated above, Mrs. Smith was first placed in the mental ward which was under lock and key, and had barred windows. She was changed to the nervous ward where she was kept for a few days, when she was put back in the mental ward, at her own request, as shown by defendants' testimony, and was placed in room No. 21, being the south room on the east side of the hall, with a door opening into the hall on the west. In the northeast corner of this room was a radiator with two pipes extending from the floor to the ceiling. One of these pipes had in it an elbow from twelve to fifteen inches in length, near the ceiling, the radiator being adjacent to and just south of said pipes. There was a bed in the room, the head of which was toward the east, so located that it extended partly over the front of the radiator; the elbow in the pipe was almost directly over the radiator and in such proximity to it that one stepping upon the radiator could readily reach the elbow. The ceiling of the room was about nine feet in height which would place the said elbow less than nine feet from the floor; the radiator was three one-half to four feet in height.

. There were seven rooms composing the mental ward, three being on the west and four on the east of a separating hallway. Each room opened into the hallway by means of a door; and at the south end of the hallway was a bath and toilet room. The nurse, or attendant, maintained her desk and chair on the east side of the hallway and within eighteen inches of the door leading to room 21, which was the most southerly of the four rooms on the east side of the hall.

On the night of September 11-12, the door to room 21 was open all night. The nurse on duty was Mrs. Pearson, mentioned above, who was a witness for defendants and whose name at the time of the suicide was Mrs. H. A. Major. This witness testified that she was sitting in the chair by her desk all night, save when she was attending the calls of patients in that ward; that she saw Mrs. Smith in her room at 11 P. M. on the 11th, and at 2:30 and 4:30 A. M. on the 12th, but thereafter did not look into Mrs. Smith's room until 6:15 A. M. when she went to call her to arise and dress, and found her hanging from the elbow of the pipe above mentioned, her life extinct. Her body was cold but not rigid. The witness stated that from her position at the desk where she sat, she could have heard any movement made by Mrs. Smith in getting out of bed; that Mrs. Smith had climbed to the top of the radiator, tied one end of a bed sheet about the elbow and pipe with the other end looped around her neck and had stepped off the radiator, thereby hanging herself. Witness, with two other nurses, removed the body.

Before discovering that Mrs. Smith had committed suicide, Mrs. Pearson (Major) had made up her report for the night of September 11-12, as shown by the report which is one of defendants' exhibits in

evidence not shown in the record, but is among the files. Later, the witness wrote on the back of the report card the following:

"Mrs. Smith rested well and was in a very happy mood when she retired. Was up at 11:00 to the toilet. Said she could hardly wait for Friday to arrive—the day she was to go home; looked in the room at 2:30 and she was sleeping at 4:30 good; at 6:15 found her hanging by neck in corner of room. Called Estes."

Plaintiff insists that the notation just quoted was written under the instruction, or at the dictation of, Dr. Major. However, defendants declare plaintiff's position in this respect is not borne out by the testimony of Mrs. Pearson (Major) whose testimony on this point is as follows:

"Q. I note on that report that there is some writing on the back of it and the other reports do not have any writing on the back. Can you explain that? A. Yes. After I found the body Dr. Major asked me to put a report on there as near as I could remember what had taken place during the night.

"Q. And I note you have the hour of 2:30 on there. A. Yes. I looked at all the patients every two hours, starting at 12:30 and I looked in at Mrs. Smith just the same as the others. I did not always put it down on her chart when I looked in her room because I did not keep strict account of her on account of her not being a mental patient."

The petition charges negligence in that defendants negligently and unskilfully kept and confined plaintiff's wife in a sanitarium in which there was a steam water pipe extending from the floor to the ceiling thereof, in which said pipe there was an elbow extending horizontally, near the ceiling, and near the bed and radiator; that by reason of the fact that this situation presented a ready and easy means of self-destruction, by the presence of the pipe and elbow, the radiator, bed and sheet in the room as aforesaid, rendered the said room dangerous and unsafe for plaintiff's wife while confined in said room in her deranged mental condition, unless she was constantly watched and guarded; and that defendants, their servants and employees carelessly, negligently and unskilfully failed and neglected to give said Ethel Smith the care and attention which her condition and her location in said room with the means at hand to destroy herself, required, and failed and neglected to guard and watch her when she was in such disclosed mental condition; and that said defendants, their servants and employees carelessly, negligently and unskilfully then and there left said Ethel Smith to be and remain alone and unguarded for long periods of time in said dangerous and unsafe place, so that she, in her deranged mental condition, could, by the means at hand, destroy herself; that on September 12, 1923, while she was in such deranged mental condition as to be unable to care for

or protect herself and had such suicide mania, and while she was by defendants so kept and confined in said room, with said means at hand for self destruction, and while she was alone in said room without an attendant, watch or guard for a long period of time, defendants, their servants and employees carelessly, negligently and unskilfully permitted her to commit suicide, as above described; that her death was caused by the carelessness, negligence and unskilfulness of defendants, their servants and employees; that defendants knew, or by the exercise of ordinary care could have known, that it was dangerous and unsafe to keep and confine said Ethel Smith alone and without any watch or guard in said room with said means at hand to destroy herself while she was in such deranged mental condition.

Defendants duly filed a demurrer to the petition alleging (1) that plaintiff has no legal capacity to sue; (2) that several causes of action have been improperly united, and (3) that the petition does not state facts sufficient to constitute a cause of action against defendants. The demurrer was overruled and defendants then filed answer denying each and every allegation in the petition. Upon the pleadings thus made the cause was tried to a jury, resulting in a verdict and judgment for plaintiff in the sum of $3000. A motion for a new trial was overruled and defendants appeal.

Defendants interposed a demurrer at the close of plaintiff's case which was overruled; and a peremptory instruction requested by them at the close of all the evidence was refused. These rulings of the trial court are charged as error. It is contended that under the pleadings and the evidence no negligence is shown on the part of the defendants upon which a recovery may be predicated. Defendants' position is that this suit is unusual from its very nature—a suit brought by the husband for damages, bottomed upon negligence of defendants in permitting the wife to commit suicide by hanging herself; that in an action of this nature, there can be no recovery, regardless of all other questions in the case unless deceased, at the time of taking her own life, was insane. The position of defendants in this respect is based largely upon the opinion of the Supreme Court in the case of Phillips v. Ry. Co., 211 Mo. 419, 443, 111 S. W. 109, where it is said:

"Of course, if the deceased was not insane, it matters not what means he used to end his life. If he was not insane there can be no liability upon the part of defendant. Defendant's liability must be bottomed on the facts that deceased was insane; that defendant knew such fact; and that his death was occasioned by reason of such fact."

There would be some merit in defendants' contention if the petition charged and the proof failed to establish the fact that Mrs. Smith was insane. But, as we read the petition, it charges that

plaintiff's wife was suffering from nervousness and mental diseases, and at times the petition and the evidence refer to her condition as mental derangement with suicidal mania. The petition also alleges and the evidence tends to show that defendants owned, kept and maintained a sanitarium in Kansas City, Mo., where they received, kept, nursed, watched, guarded and treated for hire, persons suffering from nervous and mental diseases; that defendants are physicians and hold themselves out to the public as skilful and experienced physicians, competent and prepared to diagnose and treat such diseases and care for, nurse and protect in their sanitarium persons so afflicted.

Testimony in plaintiff's behalf tends to show that plaintiff's wife was afflicted with nervous and mental disease with suicidal mania, and manifested a disposition to destroy herself; that defendants were fully informed of her said condition when they accepted her as a patient after examination. There is testimony tending to show that defendants were fully informed of Mrs. Smith's suicidal mania.

A similar situation is presented in the case of Davis v. Hospital, 204 Mo. App. 626, 218 S. W. 696, where the plaintiff's husband, while a patient in defendant's hospital became delirious and, in the temporary absence of his nurse, escaped from his room, fell down the fire escape and received injuries from which he died. It was charged that defendant knew his condition and that it was unsafe to leave him unguarded; that the defendant knew, or by the exercise of ordinary care, could have known that his condition was such as to render it dangerous for him to remain without a guard. The negligence charge was failure to give the patient the care and attention which his mental and physical condition demanded for his safety.

The question before the court in that case and now presented to us in the record before us is whether the evidence adduced was sufficient to justify the submission of the case of the jury on the issue of negligence. As we read the petition, the crux of the negligence charge is that defendants failed to use ordinary care to watch Mrs. Smith and thereby prevent her self-destruction by reason of her alleged nervous and mental derangement. There is substantial evidence that defendants knew of her suicidal tendency. There can be no question but that it is the law that defendants were required, not only to use ordinary care in treating the patient for her illness, but that they were required to safeguard her from injuring herself by reason of her suicidal tendency.

It seems to be defendants' position that before plaintiff can recover he is required to prove his wife was insane. We think this position without merit in view of the allegations of the petition which do not include insanity. It is not disputed that all the authorities hold that private hospitals owe to their patients such ordinary care and

attention as the mental and physical condition of such patients reasonably requires. The law demands reasonable care, such care as a reasonable man would take under the circumstances existing, but no man is required to take measures against a danger which the circumstances as known to him do not suggest as likely to happen. These circumstances include the patient's mental condition and aberrations and what he is likely to do by reason thereof, and the dangers afforded by his surroundings. [Breeze v. Railroad, 264 Mo. 258, 174 S. W. 409; Phillips v. Railroad, 211 Mo. 419, 111 S. W. 109.]

Plaintiff, having produced substantial evidence in support of the allegations of his petition, we must hold there was no error in the action of the trial court in overruling the demurrer at the close of the evidence of plaintiff. And in this view, we are following the rule laid down by this court in Bennett v. Punton Sanitarium, 249 S. W. (Mo. App.) 666, and cases therein cited.

Defendants, in their testimony, denied statements contained in testimony in behalf of plaintiff; but in this we see nothing to warrant the court in sustaining defendants' peremptory instruction at the close of all the evidence. At best, there was raised an issue of fact for the jury's consideration. An examination of defendants' citations does not change our position in this respect.

This ruling also disposes of defendants' two assignments of error predicated upon plaintiff's instruction P-1. This instruction purports to cover the entire case and directs a verdict. Defendants charge the instruction is erroneous (a) because it allowed recovery unless defendants had nurses stationed to watch Mrs. Smith day and night which was contrary to the care and duty imposed upon them. As already stated in this opinion, the degree of care and diligence required of defendant is to be measured by the mental and nervous condition of the patient and the indicated dangers surrounding her. [See cases last above cited.] (b) That the instruction is erroneous in that it allowed the jury, in assessing damages to take into account the loss to plaintiff of the "society, companionship and services of said wife, if any, and you should allow him such a reasonable amount as you may find and believe from the evidence will fairly and justly compensate him for the loss of the society, companionship, aid and services of his said wife."

There can be no question about the liability of a privately owned hospital or sanitarium, conducted for individual gain and not for charitable purposes, for damage to its patients resulting from negligence attributable to the owners or agents of such hospitals. [Breeze v. Ry. Co., supra; Hogan v. Hospital, 59 S. E. (W. Va.) 943; Harris v. Hospital, 14 N. Y. Supp. 881; Young v. Gruner, 173 N. C. 622; Robertson v. Town's Hosp., 165 N. Y. Supp. 17.] Furthermore, section 4219, Revised Statutes 1919, provides:

"And in every such action the jury may give such damages, not exceeding ten thousand ($10,000) dollars as they may deem fair and just with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue," etc.

This question is therefore determined against defendants' contention.

We have read with interest and carefully considered defendants' very able argument on this point. The position of defendants in this respect is rather unique, in that they argue that if plaintiff has established the fact that his wife was insane and that she was suffering from suicidal mania, then he has also established, under the proof offered, that she would never get well, and therefore, that he has not been damaged.

We are unwilling to accept this argument as conclusive in the face of the record. It must be held that the husband is entitled to compensation for the loss of the society and comfort of his wife as against anyone negligently depriving him thereof. The question as to the amount of his damage was for the jury to determine, under all the facts and circumstances in evidence. [Martin v. Ry. Co., 227 S. W. 129; Baldwin v. Ry. Co., 231 S. W. 280, 282.] We decide against defendants on this point.

Finally, it is charged the court erred in permitting a letter written by Mrs. Smith during her stay at the sanitarium to be read to the jury. The letter bears no date, but, obviously was written during the week of her suicide and was addressed to her husband and contains the following opening sentence:

"Bennett, by the time you get this, something may have happened."

This sentence is followed by statements clearly indicative of Mrs. Smith's mental status as alleged in the petition. Defendants interposed timely objection to its introduction in evidence, upon the ground that it tended neither to prove, nor disprove any issue in the case. The objection was overruled, doubtless, for the reason that it tended to show the mental condition of Mrs. Smith and this was one of the controverted issues in the case. In this view of the situation, the ruling of the court was proper. [Brennan v. City of St. Louis, 92 Mo. 482; Sotobier v. Transit Co., 203 Mo. 702, 102 S. W. 651, 656; Wagner v. Binder, 187 S. W. 1128, 1159.] We find no reversible error of record.

The judgment is affirmed. *Bland, J.,* concurs; *Trimble, P. J.,* absent.