Sophia Kubas, as Administratrix of the Estate of Stanley Kubas, Deceased, Claimant, v. State of New York, Defendant. (Claim No. 28434.)

Court of Claims, October 10, 1949.

*Lewis M. Mullarkey* and *James H. Glavin, Jr.,* for claimant.

*Nathaniel L. Goldstein, Attorney-General* (*Edward R. Murphy* of counsel), for defendant.

Lambiase, J. On December 2, 1946, claimant's intestate, Stanley Kubas, an inmate of the Utica State Hospital, located at Utica, New York, while temporarily away from said institution, obtained a quantity of oil of wintergreen and went into a theatre in the city of Amsterdam, New York, where he swallowed the same, from the effects of which he died the same day. Thereafter claimant filed this claim to recover " for damages arising out of and resulting from the negligence of the State of New York, its officers, agents, servants, and employees * * * in permitting claimant's deceased intestate, Stanislaus Kubas, also known as Stanley Kubas, to escape from said Utica State Hospital and to commit suicide on or about the 2nd day of December, 1946." (Claim, par. 6 in part.)

Stanley Kubas was first admitted to the Utica State Hospital on April 27, 1939, upon the petition of his brother, Joseph. The petition upon which the order committing him was granted states, among other things, that the deceased was depressed, had quit his job for causes unknown, and did not know that he did peculiar things. The certificate of the qualified examiners accompanying the petition sets forth that the deceased was depressed, and that the father of the deceased, when in a depressed mood, had committed suicide in November, 1934. The mental illness of the deceased was diagnosed as dementia praecox, hebephrenic type. He remained at said institution until he was released on parole to his family on July 29, 1939, and on July 29, 1940, he was discharged from parole.

On December 19, 1940, the deceased was certified by the health officer of the city of Amsterdam, New York, to be mentally ill. In said health officer's certificate there appears of and concerning deceased the following: " Is depressed and family feels he may do harm to himself or others. About three weeks ago shot himself which family believes was intentional, below heart. Bullet is lodged in back. Was an inmate of the Utica State Hospital about two years ago." (Exhibit B.) On December 20, 1940, deceased was again committed to the Utica State Hospital, this time upon the petition of his mother, Sophia Kubas, his mental illness, at said hospital, being diagnosed as dementia praecox, simple type. The petition on the recommitment sets forth that during the period that deceased had been out of the Utica State Hospital after his discharge from his first commitment, he had tried to commit suicide by shooting himself below the heart. The certificate of the qualified examiners accompanying the petition also states that the father of the deceased had committed suicide, and there appears therein of and concerning the deceased the following: " depressed, shot himself below the heart." Also in said certificate it is stated that in the opinion of the examiners the deceased was " Suicidal ". On a paper entitled " St. Mary's Hospital — PHYSICAL EXAMINATION ", included in the hospital record on the second commitment of the deceased, there appears, among other things, of and concerning the deceased, the following: " Diag: Depressive Mania. Psychosis with suicidal tendency."

On or about February 25, 1941, deceased was transferred to an open ward. In September, 1941, deceased was being considered for parole, and his family, although approving of his placement in a boarding home, was reluctant to have him come

home. With respect to this matter of coming home, John, a brother of the deceased, said "that he thought the patient would have to be watched since he had made a suicidal attempt, resulting in the need for the medical services costing the family $300." (Exhibit B, Entry 10/2/41.) In May, 1942, arrangements were made for the placement of the deceased in family care on a farm. Deceased, however, refused to take that placement. He was, therefore, not placed out and remained at the institution. He was continued on said open ward until April 17, 1944, when he escaped and went to the city of Amsterdam, New York where he was apprehended and returned to the hospital the following day. Upon his return he was transferred to Ward B where supervision was greater than on open ward A, and thereafter he was transferred to Ward 12 where there was even greater supervision than there was in closed Ward B. On November 17, 1944, he was again transferred to an open ward (Ward 1) where he remained until December 2, 1946, the date of his death. He was assigned to work in the kitchen. He took little interest in his surroundings, and was inclined to be very seclusive.

Ward 1 is on the ground floor of the Utica State Hospital, and the doors thereof leading to the hospital grounds remain unlocked daily from 7:00 A.M. to 6:00 P.M. As a patient of that ward the deceased was free to go out on to the grounds of the institution as often as he chose, and to walk about them unaccompanied. No guards were stationed at any of the three exits from the institution grounds. There is no doubt that to be assigned to Ward 1 deceased had had to show improvement in his mental state in the opinion of the doctors at the hospital. In fact, it was the opinion of Dr. Dorey, a physician connected with the hospital who had charge of Ward 1 and of the deceased as an inmate thereof from February, 1946, until December 2, 1946, that the deceased at the time of his death was improving to the point where he could be paroled or discharged as " Improved " or " Much Improved ".

On July 18, 1946, another privilege designated as an " extramural " privilege was extended to the deceased, viz.: that of leaving the grounds of the institution and of going unaccompanied between specified hours into the city of Utica, New York, to go to the movies. Beginning on that date and up to December 2, 1946, deceased had had that privilege given to him on twenty-one separate occasions, and on each of said occasions he had returned as required and unharmed. Each time that

this privilege was extended to the deceased by Dr. Dorey, the latter saw him and talked to him before he left the institution. As of July 18, 1946, when extramural privileges were first given to the deceased, deceased had been on an open ward without interruption since November 17, 1944, a period of about one year and eight months; and these privileges had been extended to him because of his improved behavior and on the basis of his complete record at the hospital.

On December 2, 1946, deceased was given the extramural privilege by Dr. Dorey of going to a movie in the city of Utica, New York. At that time Dr. Dorey personally conversed with him and gave him permission to absent himself from the hospital and its grounds from 4:00 P.M. to 9:00 P.M. Deceased was last seen at the hospital in the patients' cafeteria at 4:30 P.M. Shortly after 7:30 P.M. of that day he was found having a convulsive seizure in a theatre in the city of Amsterdam, New York. He was able to give his name and address to the policeman who was called to the theatre. He was taken to his home, but there was no one there. At 8:55 P.M. he was taken to the Amsterdam City Hospital where he died at 10:05 P.M. An autopsy was performed, and the coroner's decision was that the deceased had committed suicide. The cause of death was established as acute poisoning from oil of wintergreen.

It is contended by claimant that the deceased was an escapee or eloper at the time of his death. It seems to us that under the circumstances herein the deceased could have been designated as an escapee or an eloper only after 9:00 P.M.; but whether or not the deceased was such an escapee or an eloper after that hour is of no great consequence herein, since the fact of the matter is that by 7:30 P.M. he had already consumed the substance which caused his death shortly thereafter. The act of suicide was committed while deceased was in the enjoyment of his extramural privilege.

It is the position of the claimant administratrix that the deceased had suicidal tendencies; that the State of New York, its agents, servants, officers, and employees had notice thereof; that but for the extramural privileges extended to deceased he would not have had the opportunity to have committed suicide; and that the State of New York failed to exercise reasonable care and precaution in connection with the care, custody, and control of the deceased by reason of which it should respond in damages for his death. On the other hand, the nub of the position of the State of New York is that it did exercise reasonable care and precaution in connection with the care, custody,

and control of the deceased; and that what it did in that connection was in accordance with accepted psychiatric practices and procedures.

It is not disputed that a short time previous to his second commitment the deceased had received a wound below the heart which his family at all times, has maintained was self-inflicted and was an attempt at suicide. The incident was also thus classified in the second commitment papers of the deceased by the examining physicians and by others. The proof on this point of the attempted suicide of the deceased is far from satisfactory, and it is probable that the opinion of the members of this family of the deceased with reference thereto must have carried great weight with these physicians in arriving at their conclusions in the matter. The deceased, on the other hand, maintained throughout that the wound was received by him accidentally. Assuming, *arguendo,* that the incident was indeed an attempt at suicide, was there, upon the record and under these circumstances herein, a failure by the State of New York acting through its agents, officers, and employees to exercise reasonable care and diligence in its control, custody and care of the deceased? We think not.

The record discloses that improvement had been demonstrated in the condition of the deceased during his confinement at the Utica State Hospital. Especially was this improvement noted throughout the period from February, 1946, to December, 1946, during which time it was testified that the behavior of the deceased " was more or less constant. He was quiet and agreeable and cooperative to care. He tended little to mingle with other patients. He did occupy himself with tasks on the ward and in the cafeteria. He kept himself neat and clean. He did not exhibit episodes of irritability or excitement during any of that time." (S.M. 275), and he did not manifest or display any suicidal tendencies. (S.M. 275.)

Under the circumstances herein, we do not think that there was anything in the immediate history of the deceased to cause the hospital authorities reasonably to be apprehensive of any impending danger or to have anticipated that the deceased would commit suicide.

In the absence of reason indicating a need to isolate him, the State was under no necessity of locking up the deceased or of keeping him under constant surveillance. (*Calabria* v. *State of New York,* 289 N. Y. 613.) " Negligence does not exist unless there is a reasonable likelihood of danger as a consequence of the act complained of." (*Root* v. *State of New*

*York,* 180 Misc. 205, 208.) " Negligence is to be gauged by the ability of one to anticipate danger. The test of actionable negligence is not what could have been done to have prevented a particular accident, but what a reasonably prudent and careful person would have done under the circumstances in the discharge of his duty to the injured party. Failure to guard against a remote possibility of accident, or one which could not, in the exercise of ordinary care, be foreseen, does not constitute negligence ". (*Lane* v. *City of Buffalo,* 232 App. Div. 334, 338.) " The risk reasonably to be perceived defines the duty to be obeyed, * * *." (*Palsgraf* v. *Long Island R. R. Co.,* 248 N. Y. 339, 344.) And " the orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty." (*Palsgraf* v. *Long Island R. R. Co., supra* p. 343.)

" We keep within settled legal principles, however, if the State is held only to a duty of taking precautions against those risks ' reasonably to be perceived ' (*Palsgraf* v. *Long Island R. R. Co., supra* p. 344)." (*Excelsior Ins. Co. of New York* v. *State of New York,* 296 N. Y. 40, 46; *Flaherty* v. *State of New York,* 296 N. Y. 342, 346; *Fowler* v. *State of New York,* 192 Misc. 15.)

The coroner's report (S. M. 40) is to remain in evidence as is all evidence received subject to reservation.

Able counsel for the claimant and for the State and their learned briefs have eased the task of the court in its consideration of this unfortunate and tragic case; but with the foregoing principles in mind, we fail to find a basis for the imposition of liability upon the State herein. Under the circumstances, therefore, we do not reach, and it is not necessary for us to determine, the question of the contributory negligence of the deceased.

The claim herein, therefore, must be and hereby is dismissed upon the merits.