16833

SLOAN *ET AL.* v. EDGEWOOD SANATORIUM, INC.
(80 S. E. (2d) 348)

*Messrs. T. B. Bryant, Jr.,* and *Fred R. Fanning, Jr.,* of Orangeburg, *for Appellant,*

*Messrs. Marshall B. Williams,* of Orangeburg, and *Henry H. Edens* and *Henry Hammer,* of Columbia, *for Respondents,*

February 11, 1954.

STUKES, Justice.

In this action for damages for wrongful death, which was brought for the benefit of the widow and two young children of the deceased, the jury returned verdict of $25,000.00 for plaintiffs, who are now respondents. The defendant, now appellant, operated a private hospital for profit for the treatment of nervous and mental diseases, to which the deceased was first admitted as a patient on April 5, 1949, received electro-shock treatments and was dismissed, against the advice of the hospital authorities, on April 10, 1949. On the following April 27th he was again admitted as a patient at the request of his wife, who took him to the hospital, and at the request of his family physician. At this time his body was in a cast, from neck to hips, on account of a recent back injury. Because of the latter he could not be given the pre-

ferred electro-shock treatments but instead was administered sub-convulsive doses of insulin three times daily, which is a common treatment in such cases, according to the medical testimony.

Upon admission of the patient on this last occasion a bill was rendered for charges which were listed as follows: "Upon admission $285.00; weekly in advance room and board $75.00; laundry $2.00;" and without stated amount, "Special Nurses, drugs, medications, x-rays and non-resident professional services as required." Deceased's wife paid thereupon $100.00, receipt of which was noted and the following was added: "Bal. due after May 1st." The head of the hospital, Dr. Yost, testified that the referring physician personally guaranteed the payment of the hospital bill.

The patient was placed in a locked building with barred windows and was given his treatments by a male attendant. Going in and out of the building by means of a key was the Superintendent of Nurses who accompanied other patients to and from another building in which they were given other treatments and in that way she saw the deceased at approximately twenty-minute intervals, presumably only during the day. He was in a private room opposite and only about six feet from an open office which was built in the corridor, for the purpose of closer surveillance, as it was testified for the appellant; but on the fatal occasion the office was unoccupied and deceased's room door was closed. On the morning of April 30th at seven o'clock the deceased was given a hypodermic injection of insulin, after which the attendant was in and out of his room but at shortly before nine o'clock he visited another patient on the same hall and about four rooms away. Upon return to the room of the deceased he found the door closed and upon failure to receive answer to his knock, he opened the door and the deceased was not in sight; the door of the connecting bathroom was shut and upon opening it the attendant found the deceased hanging by the cord or belt of his bathrobe. The supervising nurse was summoned by telephone from another building, as was

Dr. Yost, and both soon came. The deceased was cut down, dead, and efforts to revive him failed. There was no evidence of the condition of the body, which might have thrown light on how long he had been dead.

At the time of this second admission of the deceased as a patient in the hospital he was examined by Dr. Gilbert who was in the employ of the hospital. The widow testified that after the examination Dr. Gilbert privately told her that the deceased had very definite suicidal tendencies and that constant attention would be necessary to prevent suicide so that during hospitalization he would have special nurses but would be unaware of the constant attention. Alarmed, the widow was assured that nothing would be left with the deceased by which he might be able to harm himself, and the heavy cost was explained by Dr. Gilbert by the fact that the suicidal tendencies required constant attention and special nurses at all times. This testimony was not contradicted by Dr. Gilbert; indeed, the record indicates that he did not testify.

Acts of negligence of the appellant which were alleged in the complaint included the lack or failure of: proper supervision in view of the condition of the deceased; constant attention; removal from his reach of all articles by means of which the deceased might harm himself; instruction of the hospital employees thereabout; and, generally, the failure to exercise the degree of care which a reasonably prudent person would have exercised under the circumstances. The only content of the answer which is pertinent upon appeal is the denial of negligence.

The attendant testified by deposition that he was trained and experienced in his field. Upon admission of the deceased as a patient in his care he was instructed by his superiors to watch the patient as closely as possible because he had suicidal tendencies. The witness was on duty from 7:00 A. M. until 3:00 P. M. and was then the only attendant in the building, in which there were about twenty-four patients in all but only one other who was undergoing insulin therapy.

During the day the upstairs patients were kept downstairs and at this time they were in the recreation room or lobby. The deceased was cheerful and talkative that morning and asked for pencil and paper to write to his wife. The witness said he left him alive at about five minutes to nine and closed the room door at the request of the deceased; upon return after about five minutes he found the deceased as has already been stated. In addition to caring for the deceased and ministering to him as directed by Dr. Yost, the witness described his duties to the many other patients in that building as follows: "To keep those patients occupied, administer whatever medications were ordered by Dr. Yost and to see that they were not out of their rooms, as we had both male and female patients in this building." (His employment was terminated soon afterward, Dr. Yost said because he borrowed money from patients' families.)

The bedside record or chart was introduced in evidence and it contained pulse rate and remarks as of 8:55 but it showed an erasure of the figures and respondents argue that the original entry was of 8 o'clock, which indicates that there may have been an interval of about an hour during which the attendant did not see the deceased. The fact of the hanging until death also reasonably supports the inference that the deceased had more time to himself than five minutes. The failure to introduce evidence of the condition of the body has been mentioned. The trial judge commented in his order refusing new trial that there was evidence from which it might be inferred that the deceased was unattended for a period approaching an hour.

A witness for respondents, although subpoenaed by appellant, was a physician and psychiatrist who had been on the staff of the State Hospital, with years of experience and familiar with insulin therapy, which is accepted in such cases by the profession. He testified that one who is determined upon suicide cannot be prevented without constant attention and it is possible even with that; good practice requires in such cases the presence of physicians or nurses with patients

at all times; one nurse should care for one patient and in no event for more than two patients of suicidal tendencies, and then the two patients should be kept together; at the State Hospital nothing is left with patients of suicidal tendencies with which they can harm themselves and they are kept under close and constant supervision and always in the company of other patients. It is dangerous to leave a bathrobe cord with or within reach of such a patient.

In contradiction of the testimony just recited, appellant offered as a witness a general practitioner who had referred many patients to appellant which, in his opinion, gave excellent professional care; he said that it is necessary that one who is mentally disturbed build up confidence in himself, which constant and uninterrupted supervision impedes and therefore tends to develop suicidal inclinations; this witness thought it practically impossible to prevent suicide by one who is fully resolved to destroy himself. There was similar testimony in behalf of appellant by another doctor who is Chief of the Mental Hygiene Clinic of the Veterans' Administration Regional Office in Columbia. He vouched for the ability of Dr. Yost as a psychiatrist and testified that the appellant institution was recognized and patronized by the Veterans' Administration. The witness thought it impossible to prevent suicide by a determined patient by the use of any precaution; he knew of suicides of patients who were restrained in straitjackets; appellant used accepted methods of treatment.

There is no exception to the instructions to the jury or to the admission or exclusion of evidence. The appeal is from the refusal of timely motions by appellant for nonsuit, directed verdict, judgment *non obstante veredicto* and for new trial. One of the grounds of the latter was the alleged excessiveness of the amount of the verdict; only that and the contention that there was no evidence of negligence have been pressed on appeal. We find error in neither.

The liability asserted is not as rare as the absence of pertinent decisions in this State would indicate. Many cases

from other courts are reviewed in the annotation in 11 A. L. R. (2d) 751, entitled "Civil liability for death by suicide," beginning at page 775, par. 13, "Liability of hospitals," etc. The general rule deduced from the authorities and stated by the author at page 776 follows: "A hospital or sanitarium owes its patients or inmates a specific duty of care. If it neglects this duty * * * and through the neglect the patient or inmate is enabled to commit suicide, the hospital or sanitarium becomes liable for its negligence under the applicable wrongful death statutes. It appears to be well settled that the owner of a noncharitable hospital or sanitarium is liable for damages for the suicide of a patient if it proximately results from the negligence of employees of the hospital." (Cases of suicides by hanging are separately digested, beginning at page 788, par. 21.)

In the order denying judgment *non obstante* and new trial similar statement of the foregoing rule was cited from 41 C. J. S., Hospitals, 8(c) (3), p. 349. To the same effect is 26 Am. Jur. 595, 596, Hospitals and Asylums, sec. 14.

We are indebted to the brief of appellant's counsel for citation of the note entitled, "Hospital Liability for Non-attendance of Patient", in Notre Dame Lawyer, Winter, 1951, page 314, which contains a painstaking review of numerous decisions. From page 315 *et seq.* we quote: "The test for determining the proper care to be used is foreseeability. If the injury results from some harmful condition or act of the patient, the liability of the hospital for the injury depends on whether the condition or act of the patient was one that could have been reasonably anticipated and the injury prevented. Since those administering hospital care are obliged to have such training and skill as will enable them to exert ordinary and reasonable care in the treatment and care of the patient, the hospital will be held responsible for the knowledge it should have ascertained from the patient's condition by the proper exercise of such requisite skill and training. Therefore, this implied knowledge, coupled with the actual knowledge which the hospital is proven to possess,

is the basis for applying foreseeability. Ordinary factors to be considered within the scope of foreseeability are the mental and physical condition of the patient, the dangers afforded by his surroundings, and the conduct of the patient, both before and after admittance to the hospital. The last named factor, however, does not necessarily burden the hospital with the duty to investigate the patient's past history, but refers to the facts given to the hospital at the time of admittance. * * * It is not necessary that the particular injury resulting from the act be foreseen * * *. Whether the length of time that a nurse is absent ·is in itself indicative of negligence usually depends on the circumstances of each case. * * * Generally, a hospital is not considered to be an insurer of the patient's safety, but where the patient may require constant attendance the consideration of such a standard is immaterial. This is true with regard to cases involving self-inflicted injuries. The hospital owes a duty to safeguard and protect the patient from any known possibility of self-harm or reasonably apprehended danger. A *prima facie* case of negligence is established when it is shown that a hospital, having knowledge of a patient's suicidal tendency, leaves the patient unattended, and the patient during the absence of the attendant commits suicide. * * * In some cases it is not foreseeable that a patient left unattended will come to self-harm and the hospital may not be held liable since no one is required to take measures to avert that which a reasonable person under similar circumstances would not anticipate as likely to happen. * * * In the case of a contract, where it does not expressly or specifically provide for a certain minimum degree of care, such as constant attendance on the patient, the hospital, nevertheless, may be liable for not providing such degree of care. * * * In summary, it may be said, that the factors which make the non-attendance of a patient a negligent act for which the hospital is liable, are the condition of the patient or the circumstances in which the patient is left alone, when either the condition or the circum-

stances are known or ought to be known, and the injury that occurs is one that would be likely to happen when viewed in the light of experience or the realm of foreseeability."

Appellant relies strongly upon *Root v. State, Court of Claims of New York,* 1943, 40 N. Y. S. (2d) 576, and *Fowler v. State,* 1948, 192 Misc. 15, 78 N. Y. S. (2d) 860. These cases involved improved patients of long standing who did supervised work in the company of other patients but nevertheless managed to hang themselves. The facts differentiate the cases from this, as they did from former New York cases in which there were recoveries for the plaintiffs. We quote from the opinion in the *Root case* [40 N. Y. S. (2d) 578] : "There was nothing in the dormitory or about the window at which the decedent hung himself that would have led a reasonably prudent person in charge of the deceased herein to perceive that the deceased would attempt suicide in the presence of the other two inmates at that time and under the circumstances herein stated. The cases of *Robertson v. Charles B. Towns Hospital,* 178 App. Div. 285, 165 N. Y. S. 17, *Shattuck v. State, supra* [166 Misc. 271, 2 N. Y. S. (2d) 353], *Spataro v. State,* 166 Misc. 418, 3 N. Y. S. (2d) 737, *Martindale v. State, supra* [244 App. Div. 877, 281 N. Y. S. 686], and *Dimitroff v. State,* 171 Misc. 635, 13 N. Y. S. (2d) 458, cited by the claimant, are not controlling herein. The facts in each of said cases are quite different from those in the case at bar. In the *Robertson case,* a window was permitted to be unguarded, which allowed the escape; in the *Spataro case,* a vat containing hot liquid soap was allowed to be unguarded and within reach of the inmate; in the *Martindale case,* a window was permitted to be in such condition as to allow the removal of a lug and enabled the inmate to escape; in the *Dimitroff case,* there was no surveillance or attendance or watchfulness of the inmates in a disturbed ward for at least an hour; and in the *Shattuck case,* a window was allowed to

be in such condition as to enable the inmate to open the same and to escape therefrom."

A late New York case which was decided subsequently to the foregoing and to the A. L. R. annotation which is cited *supra* is *Murray v. St. Mary's Hospital,* 1952, 280 App. Div. 803, 113 N. Y. S. (2d) 104, 105, where judgment of nonsuit at the close of plaintiff's case was reversed and trial by jury ordered. The patient jumped from a window when the nurse, quoting from the opinion, "left to make a telephone call requested by the patient; and the suicide took place while the doctor either went into the hall or stood in the doorway with his back to the patient, to ascertain if the nurse had made the call. There was ample proof that defendant knew, or should have known, of decedent's mental disturbance."

The rule in New York which is the result of the consideration of many cases was summed up in *Kubas v. State,* 1949, 198 Misc. 130, 96 N. Y. S. (2d) 408, 412, Court of Claims, without jury, as follows, citing supporting cases: " 'We keep within settled legal principles, however, if the State is held only to a duty of taking precautions against those risks "reasonably to be perceived" ' ." In our case the risk of suicide of the decedent was well known to appellant, its officers and employees. (It should be added that by statute in New York the State is liable for negligence of its State-owned and operated hospitals as is a privately-owned hospital generally.)

The most recent decision of the court of last resort of New York (the Court of Appeals) appears to be *Santos v. Unity Hospital,* 1950, 301 N. Y. 153, 93 N. E. (2d) 574, 576, opinion by Chief Judge Loughran, which affirmed verdict for the death of a maternity patient who jumped or fell from a window in the delivery room, when left alone by the nurse who went to answer the telephone. Two issues of alleged negligence were held to have been properly submitted to the jury—the lack of bars on the window and

leaving the patient unattended. The opinion concludes: "Thus there was left to the jury the question whether the defendant hospital was negligent when in the decedent's exigency it withdrew from her all personal care without securing the window through which she then and there helplessly fell to her death. This submission of the issue was right, in our judgment." The case at bar may be simulated to that by substituting the means of self-destruction here used, which was the bathrobe belt.

Reliance is also had by appellant on *James v. Turner,* 1941, 184 Tenn. 563, 201 S. W. (2d) 691, but in that case, where verdict for plaintiff was set aside, the patient was walking for recreation with a guard or attendant when he broke and ran to a water-tank, scaled the ladder and plunged to his death by drowning, without opportunity to the attendant, although present, to prevent it. The court simply found that there was no evidence of negligence, which cannot be said of the facts here in evidence.

It is earnestly contended by appellant that the standard of proper care in such a case as this was established by the medical testimony and it was fully met in this case, wherefore there could have been no negligence. Its point is that the jury were bound by the expert testimony to which reference has been made. But it was in sharp conflict, as is seen above, and thereby an issue of fact was presented. Moreover, we do not think that this is a case in which expert testimony is required to establish a standard of due care. In the malpractice case of *Waynick v. Reardon,* 236 N. C. 116, 72 S. E. (2d) 4, 7, it was said, pertinent here: " 'The absence of expert medical testimony, disapproving the treatment or lack of it, is not perforce fatal to the case. There are many known and obvious facts in the realm of common knowledge which speak for themselves, sometimes even louder than witnesses, expert or otherwise.' * * * Hospitals and members of the medical profession are held in high esteem and in most cases en-

joy the general affection of the public. They are, of course, entitled to every reasonable consideration, but there should not be drawn around them unnatural or artificial immunities to shield them against acts of negligence."

In none of the many hospital-suicide cases that we have read has it been held that the standard of care which the jury should apply in determining whether there was negligence can be established only by expert testimony. On the contrary, it was said by the court in the case of *Paulen v. Shinnick*, 291 Mich. 288, 289 N. W. 162, 164, where a patient of known suicidal tendencies jumped through a third-story window: "Determination of whether Miss Rose (the nurse) should have locked the screen before stopping to retrieve plaintiff's fallen thimble, or to have taken some other precaution to prevent plaintiff's escape, is not a question on which a jury requires the advice of trained psychiatrists. *LeFaive v. Asselin*, 262 Mich. 443, 446, 247 N. W. 911. The verdicts were supported by sufficient evidence notwithstanding the fact that expert testimony was not offered by plaintiff."

We are constrained to hold that under the evidence adduced in this case the issue of negligence was properly submitted to the jury for their solution and, by their verdict, they found negligence, which was a reasonable inference from the facts before them.

Lastly, appellant attacks the amount of the verdict as excessive. Its exception thereabout follows: "The court erred in refusing defendant's motion for a new trial on the grounds that the verdict was excessive, the error being that the evidence shows that the deceased was totally, permanently and hopelessly disabled and would have been a burden to his family the rest of his life."

The only evidence that the deceased was in an incurable condition was the opinion expressed by the head of the hospital in his testimony, which the jury of course did not have to accept, especially because it was inconsistent with

the admittance of the deceased to the hospital as a patient and its treatment of him and, indeed, inconsistent with other portions of the same witness' testimony. A more reasonable inference from all of the facts is that improvement and eventual cure were anticipated by all concerned, including appellant and its doctors. Surely the hope, express or implied, of at least substantial benefit was held out in return for the costly care and treatment which the hospital agreed to provide. Like contention was made in the hospital-suicide case of *Smith v. Simpson,* 221 Mo. App. 550, 288 S. W. 69, 73, and overruled with the following comment: "The position of defendants in this respect is rather unique, in that they argue that, if plaintiff has established the fact that his wife was insane and that she was suffering from suicidal mania, then he also established, under the proof offered, that she would never get well, and therefore that he has not been damaged. We are unwilling to accept this argument as conclusive in the face of the record. It must be held that the husband is entitled to compensation for the loss of the society and comfort of his wife as against any one negligently depriving him thereof. The question as to the amount of his damage was for the jury to determine, under all the facts and circumstances in evidence."

The trial court, in whose discretion the matter lay upon timely motion by appellant, concluded that the verdict was reasonable in amount, and we agree. Decedent was an insurance executive, in business in Columbia and Charlotte, earning around $15,000.00 annually during the several years preceding his death, of which he contributed about $7,000.00 annually to the support of his family. The shock of his death necessitated the hospitalization of his young son, who was thirteen years old at the time of the trial.

Other matters were argued in the briefs as bearing upon the propriety of the amount of the verdict but they were not raised by the only exception, quoted above, which relates to the verdict, hence they have not been considered.

The exceptions are overruled and the judgment affirmed.

BAKER, C. J., TAYLOR and OXNER, JJ., and JOSEPH R. Moss, A. A. J., concur.