23227

Norma A. BRAMLETTE, Executrix of the Estate of Joe M. Bramlette, Respondent v. CHARTER-MEDICAL-COLUMBIA d/b/a Charter Rivers Hospital and David A. Pillinger, M.D., Appellants.

(393 S.E. (2d) 914)

Supreme Court

*Jeter E. Rhodes, Jr.,* and *Ronald James Tryon,* of *Whaley, McCutchen, Blanton & Rhodes,* Columbia, *for Pillinger.*

*Monteith P. Todd, William C. Hubbard,* of *Nelson, Mullins, Riley & Scarborough,* Columbia, *for Charter.*

*David J. Mills, Clarence Davis,* and *Richard Smith,* of *Mc-Nair Law Firm, PA,* Columbia, *H. Hugh Rogers* and *J. Michael Fullwood,* of *Rogers, Duncan, Fullwood & Derrick,* Lexington, *for respondent.*

Heard April 17, 1990.

Decided June 18, 1990.

GREGORY, Chief Justice:

This is a medical malpractice action. We affirm in part and reverse in part.

Respondent's decedent, Joe Bramlette, was voluntarily admitted to appellant Charter Rivers Hospital on Monday, May 4, 1987, for psychiatric treatment. Appellant Dr. Pillinger was Bramlette's treating psychiatrist. On Friday, May 8th, Bramlette went off the hospital grounds on a recreational outing with a small group of fellow patients and an occupational therapist, Kim Stroud. On the return trip to Charter Rivers,

Bramlette told Stroud he was going to vomit and urged her to pull the hospital vehicle off the road to let him out. Strout pulled the van to the edge of the road and Bramlette jumped out. He ran to a highway overpass twenty feet away, climbed up on the ledge and flung himself to his death. As a result, respondent commenced this action against Dr. Pillinger and Charter Rivers.

At trial respondent produced the following evidence. Joe Bramlette was fifty-one years old at the time of his death in 1987. He was first admitted to Charter Rivers during the previous year for a drug and alcohol abuse problem which he overcame with treatment. In February 1987, Bramlette was fired after only six months on a new job over which he experienced great distress. In April 1987, he began a new job. During a training seminar on Friday, April 30, 1987, Bramlette suffered a severe anxiety attack and was taken to a hospital emergency room. Although he was released that same day, Bramlette's wife and daughter were concerned for his well-being and arranged for him to see Dr. Pillinger at Charter Rivers the following Monday.

During the weekend, Mrs. Bramlette became fearful her husband intended to kill himself. He talked frequently about his life insurance policies and told Mrs. Bramlette she should not worry about losing the house. During a drive through Columbia, Bramlette pointed out two sites where some other person had committed suicide by jumping from a great height.

On Monday morning, Bramlette went to work as usual. By mid-morning, however, he suffered another anxiety attack. He called Mrs. Bramlette and arranged to meet her at their daughter's apartment. The Bramlettes' daughter, Lisa Dudley, was a psychiatric nurse at Charter Rivers. She met Mrs. Bramlette at the apartment and waited with her. Bramlette soon arrived in a very distressed state. He was hoarse and very white and told them he had been screaming in the car during the entire thirty-minute drive to Lisa's apartment. He was extremely agitated and pulled at his clothing and hair.

Lisa called Dr. Pillinger and told him her father was "suicidal" and needed to see Dr. Pillinger before his scheduled appointment that afternoon. Lisa and her mother accompanied

Bramlette to Charter Rivers. He screamed in the car and behaved erratically at the hospital. Lisa told hospital staff that her father was suicidal.

Psychiatric nurse Barbara Higdon assessed Bramlette upon his admission to Charter Rivers and indicated on her patient assessment form: "Suicidal/Homicidal Ideation: Fleeting." Bramlette was placed on suicidal precautions status which means the patient is not allowed off hospital grounds and is observed every fifteen minutes by hospital staff.

Dr. Pillinger examined Bramlette soon after his admission. He ordered Bramlette's patient status changed from suicidal precautions to active observation. Dr. Pillinger diagnosed Bramlette as suffering from atypical depression and ordered assertiveness training and other therapy along with medication. Hospital staff and Dr. Pillinger observed Bramlette appeared less anxious, less depressed, and more hopeful for the future during the next few days following his admission. Bramlette killed himself on the fifth day. Hospital personnel never contacted Lisa or Mrs. Bramlette to obtain a detailed personal history in order to update the hospital's information from Bramlette's first admission for substance abuse.

Respondent produced Dr. Kugler as a psychiatric expert. Dr. Kugler testified it was his opinion Dr. Pillinger had deviated from the accepted standard of practice in these particulars: failing to get a complete history from the family; failing to order more intense supervision for the first seven to ten days after admission; failing to prohibit an outing off hospital grounds; failing to diagnose Bramlette as a high risk for suicide based on his anxiety attacks and his unrealistic improvement immediately upon admission to the hospital. Dr. Kugler testified that a psychiatric patient is most likely to commit suicide during the first few days after admission and that extreme vigilance is required during the initial seven to ten day period to allow the medication and therapy to begin to take effect.

Dr. Kugler also testified regarding the conduct of hospital employees Higdon and Stroud. He testified Nurse Higdon deviated from the standard of care for a psychiatric nurse in allowing Bramlette to leave the hospital grounds supervised by Kim Stroud. He further testified the hospital deviated from

accepted standards in failing to adequately train recreational therapist Kim Stroud not to stop her vehicle for any reason at a patient's request.

Appellants contend they were entitled to a directed verdict because respondent failed to prove proximate cause. We disagree.

As in any negligence action, the plaintiff in a medical malpractice action must establish proximate cause. *Hanselmann v. McCardle*, 275 S.C. 46, 267 S.E. (2d) 531 (1980). Proximate cause requires proof of (1) causation in fact and (2) legal cause. *See* W. Keeton, *Prosser and Keeton on the Law of Torts*, §§ 41-42 (5th ed. 1984); *see also Accordini v. Security Central, Inc.*, 283 S.C. 16, 320 S.E. (2d) 713 (Ct. App. 1984).

Causation in fact is proved by establishing the injury would not have occurred "but for" the defendant's negligence. *Hanselmann v. McCardle, supra; Hughes v. Childrens's Clinic, P.A.*, 269 S.C. 389, 237 S.E. (2d) 753 (1977). Legal cause is proved by establishing foreseeability. *Young v. Tide Craft, Inc.*, 270 S.C. 453, 242 S.E. (2d) 671 (1978). Although foreseeability of some injury from an act or omission is a prerequisite to establishing proximate cause, *Young v. Tide Craft, supra; Stone v. Bethea*, 251 S.C. 157, 161 S.E. (2d) 171 (1968); *Kennedy v. Carter*, 249 S.C. 168, 153 S.E. (2d) 312 (1967); *Accordini v. Security, supra*, the plaintiff need not prove that the actor should have contemplated the particular event which occurred, *Greenville Memorial Auditorium v. Martin*, — S.C. —, 391 S.E. (2d) 546 (1990); *Young v. Tide Craft, supra.* The defendant may be held liable for anything which appears to have been a natural and probable consequence of his negligence. *Greenville Memorial Auditorium v. Martin, supra; Childers v. Gas Lines, Inc.*, 248 S.C. 316, 149 S.E. (2d) 761 (1966). A plaintiff therefore proves legal cause by establishing the injury in question occurred as a natural and probable consequence of the defendant's negligence.

Generally, expert testimony is required to establish proximate cause in a medical malpractice case. *Green v. Lilliewood*, 272 S.C. 186, 249 S.E. (2d) 910 (1978). Expert testimony is not required, however, to prove proximate cause if the common knowledge or experience of layper-

sons is extensive enough to determine the presence of the required causal link between the medical treatment and the patient's injury. *Pederson v. Gould,* 288 S.C. 141, 341 S.E. (2d) 633 (1986); *King v. Williams,* 276 S.C. 478, 279 S.E. (2d) 618 (1981); *Green v. Lilliewood, supra.*

Here, respondent produced evidence of causation in fact from which such a causal link could be determined with a layperson's knowledge. Dr. Kugler testified a suicidal patient must be intensively supervised for the first seven to ten day period following admission to allow treatment to become effective. Dr. Kugler did not expressly state an opinion that appellants' negligence caused Bramlette's death. From his testimony, however, it is reasonable to infer that but for appellants' failure to properly diagnose, treat, and supervise Bramlette during this initial period, Bramlette would have overcome his suicidal impulses and would not have killed himself.

Further, Dr. Kugler testified a depressed patient who has contemplated suicide and who exhibits a high level of energy, as Bramlette did, is a high risk for suicide. The evidence indicates Dr. Pillinger and hospital staff knew a suicidal patient should not be allowed off hospital grounds because of the increased opportunity for self-harm. Thus, respondent produced evidence it was foreseeable Bramlette would commit suicide as a natural and probable consequence of appellants' negligence in allowing him off hospital grounds. We conclude respondent presented sufficient evidence to submit the issue of proximate cause to the jury.

Appellant Dr. Pillinger asserts the intervening cause of Kim Stroud's negligence in stopping the hospital vehicle renders his own negligence a remote and not proximate cause of Bramlette's death. Under South Carolina law, the primary wrongdoer's action is a legal cause of an injury if either the intervening act or the injury itself was foreseeable as a natural and probable consequence of that action. *Young v. Tide Craft, supra,* citing *Benford v. Berkeley Heating Co.,* 258 S.C. 357, 188 S.E. (2d) 841 (1972). As discussed above, respondent not only established causation in fact, she produced evidence establishing Bramlette's death was foreseeable as a natural and probable consequence of Dr. Pil-

linger's failure to restrict him to suicide precautions status. Respondent therefore established Dr. Pillinger's negligence as a proximate cause of the injury.

Next, appellants contend Bramlette was contributorily negligent or assumed the risk as a matter of law because he was not insane and therefore acted knowingly when he killed himself. This Court has recognized a cause of action in negligence for breach of duty to prevent a known suicidal patient from committing suicide. *Sloan v. Edgewood Sanatorium, Inc.*, 225 S.C. 1, 80 S.E. (2d) 348 (1954). Where such a duty exists, as here, clearly the very act which the defendant has a duty to prevent cannot constitute contributory negligence or assumption of the risk as a matter of law. *Accord Cowan v. Doering*, 215 N.J. Super. 484, 522 A. (2d) 444 (1987).

Finally, Charter Rivers asserts error in the trial judge's refusal to allow testimony by its undisclosed expert witness, Nurse Jenniver Savitz. As proffered, Nurse Savitz's testimony would have rebutted Dr. Kugler's testimony that Nurse Higdon breached the standard for care for a psychiatric nurse in failing to exercise her own discretion based on her personal knowledge of the patient.

It is well-settled that a ruling on the admission of evidence is within the trial judge's discretion and will not be disturbed absent an abuse thereof and a showing of prejudice. *Manning v. City of Columbia*, 297 S.C. 451, 377 S.E. (2d) 335 (1989). Despite specific deposition inquiries and supplemental discovery requests, Charter Rivers was never informed that Dr. Kugler had an opinion regarding the negligence of any employee other than Kim Stroud. Under these circumstances, it was error for the trial judge to exclude Nurse Savitz's testimony. Charter Rivers was clearly prejudiced by the exclusion of this evidence since Dr. Kugler's testimony on the issue of Nurse Higdon's negligence remained uncontradicted. We therefore reverse and remand for a new trial as to Charter Rivers.

We dispose of appellants' remaining exceptions pursuant to Supreme Court Rule 23. The judgment of the circuit court is

Affirmed in part; reversed in part.

HARWELL, CHANDLER, FINNEY and TOAL, JJ., concur.