### HARRIS v. WOMAN'S HOSPITAL IN THE STATE OF NEW YORK.

(*Common Pleas of New York City and County, General Term.* June 1, 1891.)

HOSPITAL—DUTY TO PATIENT—NEGLIGENCE.

In an action against a hospital for negligence causing the death of plaintiff's intestate, it appeared that intestate was received by defendant as a patient, and submitted to a surgical operation, which was apparently successful. About four days later, at 1 o'clock in the morning, the attention of the nurse in attendance was called by an occupant of the same ward to the fact that intestate was trying to get up. The nurse told her (intestate) that she must stay in bed, else she would injure herself. The nurse then went down stairs, and reported what had occurred to the house surgeon, who prescribed a sedative. The nurse administered the sedative, after which intestate apparently fell asleep. About 4 o'clock that morning the nurse, while attending a patient in another part of the ward, heard the noise of a shutting door, and, on going to see what was the matter, found that intestate had left her bed, gone into an adjoining room, and thrown herself from the window. The ward in which intestate lay contained 19 patients, and was attended by 3 nurses in the day-time, and by 1 nurse at night. One physician was in attendance at the hospital all night, and had from 50 to 75 patients under his care. The physician had seen intestate every day after the operation, and saw nothing wrong with her. There

was no lack of skill on the part of the surgeons who performed the operation, or of the house surgeon. *Held*, that there was no evidence of negligence on the part of defendant.

Exceptions from trial term.

Action by Abraham Harris as administrator, etc., against the Woman's Hospital in the state of New York. The complaint was dismissed, and plaintiff's exceptions were ordered to be heard at general term in the first instance.

Argued before DALY, C. J., and BISCHOFF and PRYOR, JJ.

*Edward Russell*, for plaintiff. *Hoppin & Talbot*, (*P. H. Vernon*, of counsel,) for defendant.

DALY, C. J. This is an action to recover damages for the death of Jennie Harris, the wife of Abraham Harris, the plaintiff, who, as her administrator, claims under the statute which gives a right of action for the wrongful act, negligence, or default causing the death of a person who would have had a cause of action for such wrongful act, neglect, or default if death had not ensued. Code, § 1902. The deceased was received as a patient in the Woman's Hospital in the city of New York on January 9, 1889, for treatment for a lacerated *cervix*, and submitted to an operation performed by the late Dr. James P. Hunter, assisted by Dr. Clement Cleveland and Dr. Lemuel G. Baldwin, on January 14, 1889. The operation was apparently successful; but about 4 o'clock in the morning of January 19th, while laboring under a temporary fit of insanity, she arose, unobserved, from her bed in the ward where she lay, and, finding her way to the toilet-room of that floor, leaped from the window, and was killed by her fall of four stories to the ground below. In the ward in which Mrs. Harris lay, which was a section of the Baldwin pavilion of the hospital, and which was 85 feet long by 25 feet wide, there were beds for 19 patients, and all were occupied. Three nurses were on duty by day, but only one at night. A physician was in attendance all night, who had 50 to 75 patients under his care. He saw Mrs. Harris every day after the operation, and sometimes oftener. He saw nothing unusual in her condition after the operation. The night of the fatal accident her pulse was very nearly normal, with nothing to indicate fever or anything wrong. She read her prayers until the lights were put out, and was quiet until about 1 o'clock A. M., when the attention of the nurse, Miss Carson, was called by Mrs. Curoe, the patient in the adjoining bed, to the fact that Mrs. Harris had called her up, and was moving in her bed. The nurse went to her, and found her trying to get out of bed, and told her "she would injure herself if she got out of her bed; that she must stay in bed, and ask for anything she wanted, because she would spoil her operation if she tried to get out any more." Mrs. Harris lay on the bed, and was quiet after that, and the nurse went down, and told the doctor what Mrs. Harris had tried to do. He prescribed two drachms of bromide, a common sedative, usually prescribed for the purpose of quieting the general nervous system, and by so doing produce sleep. The nurse administered the remedy to Mrs. Harris, who after that was quiet, and apparently asleep. About 4 o'clock the nurse passed her bed, and she was apparently asleep. The nurse went to a bed four beds from hers to attend another patient, and while there heard the noise of a shutting door at the other end of the ward. Going to see what was the matter, she found that the wind had blown the door open and slammed it. The nurse from the floor below heard the noise and came up. Miss Carson thought of Mrs. Harris, went to the bed, and found it empty; she having stolen so quietly from the room that she was not heard. The window of the little toilet-room located just off the ward was found open, and a chair placed so that anybody could get up to the window and out of it. The body of Mrs. Harris was found in the yard beneath this window. It is claimed by the plaintiff that the negligence of the

hospital authorities was the cause of the death, and that this negligence was in not providing more than one nurse at night to look after the patients in the particular ward, and a nurse more experienced than the nurse in charge; also in not providing a physician to sit up at night, and watch the patients, and prescribe from his personal examination; and in not providing more than one physician to attend to these patients at night, and one more experienced than the surgeon in charge.

There can be no charge of negligence, unless there is a breach of duty imposed by law; and, to ascertain whether there was negligence on the part of the hospital authorities in this case, the duty which the law imposes upon them must be considered. Their duty is to exercise ordinary and reasonable care in furnishing medical attendance and nursing to the patients whom they receive. This care is not to be apportioned to the amount of money which the patient contracts to pay, and is wholly irrespective of any consideration growing out of the fact that the sum paid, or agreed to be paid, is less than the actual cost to the institution of maintaining, treating, and caring for such patient. The same care must be taken of a charity patient as of one who pays the highest price demanded for hospital accommodation. In this respect the same rule applies to hospital authorities as to individual physicians, and the rule as to the latter is well stated: "It may be considered as a received principle of law that a physician having rendered his services gratuitously, as in hospitals, or among outdoor poor, is bound to exhibit the same degree of ordinary diligence and skill in the treatment of a patient as though he were acting under the incentive of a consideration or a prospective reward. If he undertakes to execute the trust reposed in him, he is bound to do it well, or else he may be compelled to respond in damages to the party injured by his misfeasance. He cannot apportion medical skill, or his diligence, to meet the prospective emoluments flowing out of any given case." Ordr. Med. Jur. § 27. "Whether the patient be a pauper or a millionaire, whether he be treated gratuitously or for a reward, the physician owes him the same measure of duty and the same degree of skill and care. He may decline to respond to the call of a patient unable to compensate him, but, if he undertake the treatment of such a patient, he cannot defeat a suit for malpractice, nor mitigate a recovery against him upon the principle that the skill and care required of a physician are proportionate to his expectation of pecuniary recompense." Per PRYOR, J., charge in *Becker* v. *Janinski*, (not reported.) See 39 Med. Rec. 461. "A doctor attending a poor person out of charity would be liable for mere ordinary negligence in the treatment of his patient, and constructively it would not be mere ordinary negligence because his profession implies skill." Shir. Lead. Cas. 43; *Shiells* v. *Blackburne*, 1 H. Bl. 158. The observation in Shear. & R. Neg. § 432, that a physician or surgeon attending gratuitously is liable for gross negligence only, is qualified and explained by the context enunciating the principle that, as the duties of a physician relate to the preservation of human life, it may be gross negligence to fail in giving such attention to his patient as would only be expected from a well-paid person in respect of matters of more pecuniary value. The deceased, then, whatever her pecuniary arrangement with the hospital authorities, being entitled to the same degree of care as every other patient, the defendant was bound to exercise, as we have said, ordinary and reasonable care in furnishing medical attendance and nursing. They were bound to supply the services of a physician and surgeon possessed of the same degree of skill, learning, and experience to be expected of his profession generally; for such qualification is all that a patient has the legal right to expect of any attending physician. *Small* v. *Howard*, 128 Mass. 131; *Hathorn* v. *Richmond*, 48 Vt. 261. See Rogers, Law and Medical Man, c. 5, and cases quoted. "The diligence and skill required are reasonable or ordinary; diligence and skill such as is manifested or possessed

by the profession as a body; not the highest degree, nor that degree which is possessed only by the most eminent of the profession." McClel. Malp. 521, and cases cited.

It was proved without contradiction in this case that Dr. Hunter, the surgeon who operated upon Mrs. Harris, was one of the best-known surgeons in the country, and was selected by her, and there is no question as to the proper performance of the operation. It was also proved that Dr. Baldwin, the house surgeon, who was on duty the night of her death, had had charge of her after the operation; that he was a graduate of the Long Island College Hospital, 1886, and secured his position in the Woman's Hospital in 1887, at the age of 25 years, after a competitive examination; and there was no attempt to show that he lacked the necessary skill, learning, or experience for his position. As to the nurse who was in attendance on the night in question, her capacity and competency for the place were conceded on the trial.

There being no dispute as to the learning, experience, and skill of the physician in charge, nor as to the capacity and competency of the nurse in attendance, the questions remaining to be considered are (1) whether there was actual negligence on the part of the physician and nurse in question; and (2) whether the hospital authorities were negligent in not providing a physician to sit up at night to watch the patients, and in not providing more than one nurse in the ward. These questions may be examined together, because they are to be determined by the same consideration, viz., whether the circumstances of the case required more attention than was actually bestowed upon the deceased, or upon the cases in the ward in question at the time of this accident. This question may be viewed from the standing point of the plaintiff's contention that the hospital would be liable for the actual negligence of its physician and nurse, without regard to the fact that it had exercised due care in their selection. This is questionable upon the authorities, for, in regard to the liability of a corporation for the acts of its servants, a distinction is made with respect to public charitable hospitals; it having been held with good reason that they are not liable for injury to a patient caused by the acts of their agents, where it is shown that they have exercised due care in selecting such agents. *Pryor* v. *Hospital*, 4 N. Y. Law J. 450, (November 25, 1890;) *Macdonald* v. *Hospital*, 120 Mass. 432. The last case is cited in *Laubheim* v. *Steam-Ship Co.*, 107 N. Y. 230, 13 N. E. Rep. 781, where, in respect of a steam-ship company carrying passengers, it was held, if the carrier is to provide a surgeon for its ships, its duty to the passenger is to select a reasonably competent man for the post, and is liable only for a neglect of that duty. The hospital authorities, in making rules for night attendance by physicians, and for personal inspection and watching of patients, in providing the force of night nurses was bound only to the degree of care proportionate to the danger to be apprehended, judged by the condition of affairs before the happening of the accident. "That which never happened before, and which in its character is such as not to naturally occur to prudent men to guard against its happening at all, cannot, when in the course of years it does happen, furnish good ground for a charge of negligence in not foreseeing its possible happening, and guarding against that remote contingency." *Hubbell* v. *City of Yonkers*, 104 N. Y. 434, 10 N. E. Rep. 858. There is no negligence in not making other arrangements, when there is no reason to apprehend an accident such as occurred, (*Loftus* v. *Ferry Co.*, 84 N. Y. 455;) and there is no liability except for the natural or probable, and therefore the direct, consequences of the acts complained of. There is nothing in this case to show that the house surgeon, or the nurse in attendance, or the hospital authorities, had any reason to apprehend any mental aberration of the deceased, much less the particular accident of the night in question. If the fact that the deceased attempted to get out of bed about 1 o'clock was sufficient to call for imme-

diate attention, it was given.   The nurse reported the fact instantly to the physician,. who immediately prescribed a sedative, which was administered. After that, the patient was quiet for about three hours, and there was no further ground for apprehension.   If the attempt to get out of bed was indicative of mental disturbance, the fact that the patient listened to the nurse's argument, and complied with her remonstrance, showed that she was amenable to reason.   But, if there were any want of care in not placing a special watch upon the deceased all that night to see that she did not leave her bed, the consequences of neglecting to do so were too remote to fasten legal responsibility upon the house surgeon or the hospital authorities.   An injury to her health due to interference with the success of her operation by her incautious movements is the utmost that could in reason be apprehended.   Her death in the manner detailed was not to be expected.   It was not shown that there was any possible ground for apprehending a suicidal tendency on her part.   But there was in fact no care omitted.   While the nurse's back was turned for a brief period, the deceased stealthily rose from her bed, escaped from the room, and leaped from the window.   This. was after the.patient had been quiet for fully three hours.   Even at 1 o'clock, when she had attempted to get out of bed, the nurse had left the ward altogether, to go and inform the house surgeon, and yet the deceased had not then attempted to escape.   Upon all the facts of the case, therefore, it was proper to dismiss the complaint, as there was no proof of want of care on the part of the hospital authorities, the surgeon, or the nurse.   There. were no rulings that prejudiced the plaintiff. His exceptions should be overruled, and his motion for a new trial denied, and judgment ordered for the defendant.   All concur.