JOHN H. FOWLER et al., as Administrators of the Estate of ALBERTA B. FOWLER, Deceased, Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 27627.)

Court of Claims, May 6, 1948.

*Theodore W. Charlebois* and *Claude H. Dunk* for claimants.

*Nathaniel L. Goldstein, Attorney-General* (*Frank M. Noonan* of counsel), for defendant.

GREENBERG, J. Claimants' intestate, Alberta S. Fowler, had been confined to the St. Lawrence State Hospital at Ogdensburg, New York, on April 27, 1941, as a manic depressive, and paroled on May 19, 1941, contrary to the wishes of the hospital authorities. After having attempted to commit suicide on June 30, 1941, she was returned to the hospital a few days later. While there, she was confined to the Central Hospital East, a ward wherein patients with a tendency toward self-destruction were placed, and she was later assigned on September 10, 1941, to the Reception Building for convalescent patients.

At this time, Mrs. Fowler's condition had progressed sufficiently to warrant her assignment to the Reception Building. The patients assigned to such building were "the convalescent type of patient; one who doesn't exhibit many symptoms; one who is almost well; one who is not destructive or dangerous, either to himself or to others; one who is waiting a little convalescent period to going home; or one who comes in with mild symptoms." As part of her therapy and for several weeks prior thereto, Mrs. Fowler had been working in the nurses' home, assisting the housekeepers in cleaning the rooms, making the beds and taking care of the linen. At about 8:00 A.M. on September 11, 1941, seven patients, including Mrs. Fowler, undertook to do such work at the nurses' home, consisting of fifty-seven rooms on three floors of said building. The decedent was last seen shortly after 10:00 A.M. while working on the third floor. At about 10:30 A.M. the attendant, Deschamps, finding Mrs. Fowler's working materials in the hall, called to her but received no answer. A search of all floors at first failed to reveal her whereabouts, but at about 11:00 A.M., her body was found hanging from a door hinge, suspended by a light cord, in room 55 on the third floor. At first it was believed that the

room had been occupied by a night nurse supposedly sleeping at that hour, but who had previously left and locked her room at 9:10 A.M. Upon discovery, the body was still warm and attempts for several hours at resuscitation proved futile.

An analogous situation was present in *Root* v. *State of New York* (180 Misc. 205, 207) wherein this court held: "The State is duty bound to furnish inmates of its hospitals for mental defectives with every reasonable precaution to protect them from injury, either self-inflicted or otherwise. (*Shattuck* v. *State of New York*, 166 Misc. 271, affd. 254 App. Div. 926; *Martindale* v. *State of New York*, 244 App. Div. 877, affd. 269 N. Y. 554.) While the degree of care owing to its inmates may be more exacting because they are wards of the State and the State is the guardian of their well-being and safety, the State, nevertheless, is not an insurer of the safety of the inmates of its institutions. There was no duty upon the State to maintain individual and constant supervision over the deceased herein. The State's employees and physicians had knowledge of the deceased's mental condition and had classified him as a potential suicide, but the record discloses the fact that he was not a case for isolation or for a restraining garment. He was not assigned or kept in a disturbed ward but had, as appears from the hospital record, shown signs of improvement, was co-operative, and had on occasions made statements and indicated to the physicians that he no longer entertained any thought of doing away with himself. There was nothing about his mental condition to warrant having other care or treatment than was administered to him. It is not disputed that the making of beds was a form of occupational therapy, which is a method of treatment of the deceased's condition.

"The attendant was in the corridor adjoining the dormitory into which the deceased and two other inmates went for the purpose of making up the beds. While it is true that the attendant did not constantly have the deceased within view, there was reasonable surveillance and watchfulness on his part over the deceased and the others in that group. There was nothing about the deceased's condition to justify any reasonable perception of any risk in allowing him in the dormitory with the others making up beds. He had done that on a number of previous occasions. Furthermore, there is no duty on the State to maintain individual supervision for each potential suicidal case. Any such rule of law would place an unreasonable burden upon the State and the authorities in charge of insane

patients, and would also be contrary to the accepted methods of treatment of such patients. It also appears from the record herein that to keep a patient cooped up in one room and to limit his activities and prevent his taking part in work, in doing something useful about the ward, is harmful; and that as patients lose or have lost their suicidal tendencies, they are given more leeway.

" Negligence does not exist unless there is a reasonable likelihood of danger as a consequence of the act complained of. ' Negligence is to be gauged by the ability of one to anticipate danger. The test of actionable negligence is not what could have been done to have prevented a particular accident, but what a reasonably prudent and careful person would have done under the circumstances in the discharge of his duty to the injured party. Failure to guard against a remote possibility of accident, or one which could not, in the exercise of ordinary care, be foreseen, does not constitute negligence.' (*Lane* v. *City of Buffalo*, 232 App. Div. 334, 338, 250 N. Y. S. 379, 584.)"

In the instant case, there was marked improvement in the condition of the decedent and her progress was greatly aided by the occupational therapy rendered to her. There was nothing in her immediate history to cause the hospital authorities and attendants to be apprehensive of any impending danger. As on prior occasions, she performed her work without cause for alarm or close surveillance. Periodic checks every fifteen minutes were made as to her activities and whereabouts. The court, therefore, concludes that the State was not remiss in its duty to its ward. Nor can it be said that failure to check room 55, wherein the night nurse was supposedly sleeping, until after other areas and floors had been searched, was such negligence as contributed to and might have averted her death.

Claimants having failed to prove negligence on the part of the State as a result of which the deceased met her death, the claim herein is dismissed.