**HARRIS HOSPITAL, Appellant,**

v.

**Barbara POPE et vir, Appellees.**

**No. 17584.**

Court of Civil Appeals of Texas, Fort Worth.

March 7, 1975.

Rehearing Denied April 4, 1975.

Anderson, Henley, Shields, Bradford & Pritchard, Dallas, Wynn, Irby, Brown, McConnico & Mack, and Henry C. Meyer, Fort Worth, for appellant.

Naman, Howell, Smith & Chase, and Hilton H. Howell, Louis S. Muldrow, and Larry O. Brady, Waco, for appellees.

## OPINION

BREWSTER, Justice.

Harris Hospital initiated this litigation by suing James L. Pope and wife, Barbara Pope, for a hospital bill of $6,179.45.

Barbara Pope and husband, James L. Pope, filed an answer and a counter claim against Harris Hospital seeking damages for personal injuries that Mrs. Pope sustained while a patient in the intensive care unit of the hospital. The Popes' contention was that the negligence of hospital employees proximately caused Mrs. Pope's injuries.

In their amended counter claim the Popes admitted that the charges as alleged by Harris Hospital in the sum of $6,179.45 were reasonably and necessarily incurred by the Popes in the treatment of injuries that Mrs. Pope sustained, and that they owed the hospital that sum for the treatment of her injuries and that the hospital would be entitled to an offset of that sum on the damages that they contended the hospital owed the Popes.

In view of this admission, the Popes were treated throughout the trial as the plaintiffs and Harris Hospital as the defendant. At the conclusion of a jury trial judgment was rendered for the Popes for $242,023.30 in damages, and Harris Hospital has appealed.

We reverse and render.

Mrs. Pope's injuries were self-inflicted in that the undisputed evidence shows that she opened a window and screen in the intensive care unit on the second floor of the hospital and crawled out onto the narrow window ledge and either fell or jumped from there to the ground, and thus sustained her injuries.

The only two grounds of negligence of the hospital employees that were found by the jury to have proximately caused Mrs. Pope's injuries were: (1) Harris Hospital, acting through its employees and nurses on duty in its Intensive Care Unit, failed to exercise ordinary care to keep a lookout for the care and safety of Barbara Pope (Special Issue No. 1); and (2) Harris Hospital, acting through its employees and nurses on duty in its Intensive Care Unit, failed to report to Dr. Coers, as Barbara

Pope's attending physician, her elevated pulse rate prior to the occasion when she fell (Special Issue No. 3).

Defendant's first point of error is that the trial court erred in this case in overruling its motion for a directed verdict and its motion for judgment non obstante veredicto.

Defendant argues its first ten points of error together. It therein contends that as a matter of law it is not liable to the plaintiffs under the undisputed facts of this case. Defendant under those points of error also contends that there was no evidence and insufficient evidence to support the submission of the negligence and proximate cause issues above referred to and the jury's answers thereto. Defendant in those points further contends that each of the jury's answers to those four issues (negligence and proximate cause) are against the great weight and preponderance of the evidence.

We sustain all of those contentions.

The law in Texas that is applicable to and controls the disposition of this case is set out in the case of Bornmann v. Great Southwest General Hospital, Inc., 453 F.2d 616 (5th Circuit, 1971) as follows at page 621: "Simply stated, a hospital is under a duty to exercise reasonable care to safeguard the patient from any known or reasonably apprehensible danger from himself and to exercise such reasonable care for his safety as his mental and physical condition, if known, may require. Liability exists only if the suicide proximately results from the negligence of the hospital or its employees. *The most important single factor in determining the liability of a hospital for failing to prevent the suicide of a patient is whether the hospital authorities in the circumstances, could reasonably have anticipated that the patient might harm himself.*" (Emphasis supplied.)

We hold that the rule just referred to controls the disposition of this case regardless of whether Mrs. Pope's conduct that caused harm to herself was done knowingly or unknowingly. In other words, even if Mrs. Pope crawled out the window and fell or jumped to her injury at a time when her mind was in a state of confusion, or at a time when she was having hallucinations, or at a time when she was having a temporary fit of insanity that had not been previously displayed, the defendant's liability in the case would still be determined by an application of the rule referred to. See Harris v. Woman's Hospital, 14 N.Y.S. 881 (Ct. of Com.Pleas, 1891); Edwards v. Grace Hospital Soc., 130 Conn. 568, 36 A.2d 273 (1944); Davis v. Springfield Hospital, 196 S.W. 104 (Ct. of App., Mo., 1917); and Breeze v. St. Louis & S. F. Ry. Co., 264 Mo. 258, 174 S.W. 409 (1915).

The Bornmann case, supra, also announced that the following instruction is a correct pronouncement of the law that is involved in a case such as this: " 'You are instructed that a hospital which undertakes to care for a paying patient, and to supervise and look after him, is under a duty to use that degree of care and skill ordinarily used by a hospital of the same general type in the same or a similar community in which such hospital is located at the time in question under the same or similar circumstances, in caring for and attending the patient as the patient's condition, as it is known to be, may require. You are instructed that this duty extends to safeguarding and protecting the patient from any known or reasonably apparent danger from himself, which may arise from his known mental or physical incapacity, . . . . ' "

The undisputed evidence in this case showed that the assignment of one nurse to care for every two patients in an intensive care unit is consistent with good nursing care.

The undisputed evidence established the following facts: on the evening of January 3, 1970, Mrs. Pope and her husband were involved in an automobile wreck;

Mrs. Pope sustained therein a badly fractured jaw; her jawbone and teeth were broken into several pieces which were pushed back and down in her neck; she was knocked unconscious for a period of time; a tracheotomy was performed on her in Cleburne, Texas, that evening; by 11 P.M. on January 3, 1970, Mrs. Pope had been transferred to and admitted as a patient in the defendant's hospital in Fort Worth; she was placed in the intensive care unit of the hospital; Dr. Carl Richard Coers, III, a plastic surgeon, was the doctor in charge of her case; she was scheduled for an operation to repair her jawbone on the morning of January 8, 1970; that operation had been delayed by the doctors until then to permit the face swelling to subside; during her stay in the hospital Mrs. Pope's doctor had not ordered her to be restrained in any way; at regular intervals during her stay she had been given by order of her doctor medicines to relieve her pain as well as antibiotics; at 12:45 A.M. on the morning of January 8, 1970, Mrs. Pope got out of her bed and opened the second floor window and screen that were located within 34 inches of her bed and went through the window and out onto the narrow outside ledge and from there either fell or jumped to the ground below; and it was by reason of this fall or jump, brought about by her own conduct, that Mrs. Pope sustained the very serious injuries that form the basis of this suit.

It was also undisputed that Mrs. Pope did not exhibit any signs or symptoms of irrational behavior during her hospital stay before going out the window on January 8, 1970.

Mrs. Pope testified that she did not recall events prior to the fall.

Mr. Pope testified: he visited his wife each day from January 3 to January 7; Mrs. Pope was in good spirits and joking on January 7 and looking forward to the jaw repair the next morning. He saw nothing apparently wrong with her mentally on January 7.

Her sister-in-law, Mrs. Eicher, visited on January 7 and said Mrs. Pope appeared normal and was not despondent or upset. Mrs. Pope indicated to Mrs. Eicher that she did not remember some of Mrs. Eicher's prior visits.

Episcopal Priest Maneikis visited Mrs. Pope on January 5, 6 and twice on January 7. This last day she appeared calm, there was nothing to indicate she needed restraint, and she appeared normal to him mentally.

Attending physician Coers testified he visited Mrs. Pope at least once a day from January 3 through January 7, and that her vital signs were within normal limits; she appeared alert, and able to understand; and did not at any time exhibit signs of irrational behavior. He did not order the nurses in the I.C.U. unit to take any special precaution with respect to Mrs. Pope. After the fall Mr. Pope told him that Mrs. Pope had, prior to their marriage, had some problems and had tried to do away with herself once before. Pope did not tell anyone about that until after Mrs. Pope's fall.

Dr. Harry E. Taylor, an oral surgeon, saw Mrs. Pope at 5:30 P.M. on January 7 and talked to her then about the operation scheduled for the next morning. He was to take part in the operation. She asked him questions and seemed to understand what he told her. She did not appear disturbed. He was surprised to hear that she had gone out the window. Mr. Pope told Dr. Taylor the next morning after she was hurt that he wished he had confided in Dr. Taylor that this was not the first time Mrs. Pope had tried to commit suicide, and that she had attempted it twice before.

The nurses that worked in the intensive care unit that appeared as witnesses testified that prior to going out the window Mrs. Pope exhibited no signs of irrational behavior.

The undisputed evidence showed that the intensive care unit was 32′ by 32′ in size; each nurse in the intensive care unit was

assigned to take care of two patients in the unit during their shift of duty; Mrs. Pope was in bed No. 8; Nurse Beasley was assigned the care of patients in beds Nos. 6 and 8 on the night of January 7 on the 11 P.M. to 7 A.M. shift; and Mrs. Pope's bed No. 8 was located 34 inches from the window that she went out of that night.

Nurse Beasley testified: that on the night of January 7 when she came on duty at 11 P.M. in the intensive care unit, the charge nurse reported to the new shift what had happened to each of the patients during the last 16 hours; her report was that nothing unusual had happened to Mrs. Pope in that period; at midnight Nurse Beasley took Mrs. Pope's vital signs; she was then sitting up in bed, said she felt fine, was having no pain and needed nothing and did not appear confused or disoriented; her blood pressure at that time was 140/80, temperature was 100, respiration was 20, and her pulse was 148 (about twice the normal rate); she then suctioned her trachea; all vital signs were then normal except the elevated pulse rate; Mrs. Pope knew she was going to surgery the next day and this knowledge sometimes brings about anxiety that causes an elevated pulse rate; the nurse did not report the elevated pulse rate because all of Mrs. Pope's other vital signs were then normal; Mrs. Beasley watched Mrs. Pope from time to time until 12:43 A.M. on January 8, 1970, at which time she again went to Mrs. Pope's bed to check her vital signs; Mrs. Pope then appeared asleep and when the nurse barely touched her wrist to check her pulse she jumped and appeared frightened; at this time her pulse was 144; she awakened; her color was good and her skin was warm and dry and nothing appeared abnormal except the pulse; the nurse apologized for startling her and Mrs. Pope said "Oh, that's all right"; Beasley then at 12:43 A.M. went to the bedside of her other patient in bed No. 6 which was about 16 feet away from Mrs. Pope's bed; that patient required an hourly check on urine output so Beasley went there and squatted down to where she could see to measure it; the mattress on this patient's bed blocked Nurse Beasley's view of Mrs. Pope; and while Beasley was thus bent down measuring the other patient's hourly urine output and pouring it out into another container, Mrs. Pope got out of her bed, opened the window and screen and crawled out onto the second floor ledge and from there either fell or jumped to the ground level below at about 12:45 A.M.

In the manner described Mrs. Pope caused the injuries sued for to be inflicted upon herself.

On January 20, 1970, Mrs. Pope was scheduled for another operation and when she was then taken to the operating room, her pulse went to 184.

Nurse Lillie Smith was the first to see Mrs. Pope going out the window and when she first saw her she appeared to be going out feet first. This nurse screamed and Head Nurse Gruver ran to the window, and by then Mrs. Pope was outside. Mrs. Gruver grabbed several of Mrs. Pope's fingers, but Mrs. Pope wriggled loose and fell or jumped to the ground below.

Nurse Beasley testified that when Mrs. Pope's pulse rate was still high at this 12:43 A.M. check she made, she was then going to report it to the nurse in charge as soon as she stopped at the bed of her patient No. 6 to check the urine output. Within two minutes after Beasley had left Mrs. Pope and before the urine check at bed No. 6 had been completed, Mrs. Pope went out the window and was injured before the report could be made.

Dr. Coers, Mrs. Pope's attending physician, testified that they first started giving Mrs. Pope demerol at 3 hour intervals to relieve her pain, but discontinued that on January 4 and then started giving her $\frac{1}{6}$ of a grain of morphine sulphate every 3 hours for pain. This continued until Mrs. Pope's fall. On January 7 she had been administered an injection of morphine at 6:05 A.M., another at 3 P.M., and the last

injection she had preceding her injury was at 9:50 P.M. on January 7. Mrs. Pope went out the window at 12:45 A.M. on January 8. Dr. Coers testified that if the nurses had communicated to him about Mrs. Pope's high pulse rate he would have told them to observe her closely and to check her pulse again at 15 minute to 30 minute intervals. Dr. Coers testified that if Mrs. Pope had a brain injury from the wreck it did not appear to be severe.

A resume of the undisputed controlling facts before us are: the injuries that form the basis of Mrs. Pope's cause of action were self-inflicted; she had been a patient in the defendant's hospital for more than four days and had never evidenced any signs of having suicidal tendencies or of irrational behavior; she had been a cooperative patient; her doctor had not ordered the hospital to restrain her in any way and there were no facts present to indicate that she should be restrained; although her doctor ordered from January 4, 1970, on to the time she was injured that she be given at 3 hour intervals an injection of ⅙ of a grain of morphine sulphate for her pain; there was no evidence that these injections had caused her to be irrational or confused at any time to where she needed to be restrained; her relatives did not tell hospital employees that Mrs. Pope failed to recall some of the prior visits they had made to see Mrs. Pope; and although Mr. Pope told two doctors after her injuries that Mrs. Pope had on one or more prior occasions tried to take her own life, he failed to reveal those facts to the hospital employees prior to the fall.

At the time Mrs. Pope was hurt the hospital had one of its intensive care nurses assigned to the care of Mrs. Pope and one other patient, and that nurse had personally administered to Mrs. Pope and checked her at 12:43 A.M., at which time Mrs. Pope appeared to be all right, with the exception of having the high pulse rate. The nurse then turned her back and went to measure the urine output of the other patient she was caring for, and in a two minute interval after the nurse had left Mrs. Pope's bed, she had opened the window and screen and crawled out onto the ledge and fell or jumped to the ground.

We hold that under the undisputed evidence in this case the hospital is not liable for failing to prevent Mrs. Pope from causing the injuries involved to be inflicted upon herself because the hospital employees could not reasonably have anticipated that the patient might either knowingly or unknowingly try to cause harm to herself.

As a matter of law under the undisputed facts of this case the hospital employees exercised reasonable care to safeguard Mrs. Pope from any known or reasonably apprehensible danger of her causing injury to herself and exercised such reasonable care for Mrs. Pope's safety as her mental and physical condition, as they were known to the hospital employees, required.

Were we to hold the hospital liable to Mrs. Pope under the facts of this case, it would be the equivalent of holding that the hospital is an insurer of the safety of its patients under all conditions.

We also hold that there was no evidence in this case to support the jury's finding that a proximate cause of Mrs. Pope's injuries was the failure of the nurses in the intensive care unit to report to Dr. Coers, Mrs. Pope's attending physician, prior to Mrs. Pope's fall, the fact that her pulse rate was elevated.

Her elevated pulse rate was first discovered at midnight on January 7. It was then checked again by the nurse at 12:43 A.M. on January 8, and was still found to be high. Two minutes later Mrs. Pope went out the window to be injured. The hospital thus discovered her elevated pulse rate 45 minutes before she was hurt.

Dr. Coers testified that, had he been advised that her pulse rate was 148 and of the state of her other vital signs, he would have ordered the nurses to keep check on her pulse thereafter at 15 to 30 minute intervals and to watch her closely.

We deem this to be the only evidence on the question.

█ We also hold that the evidence was insufficient to support the jury's answers to both Special Issue No. 2 and Special Issue No. 4. These are the two proximate cause issues that the jury answered against the hospital.

In addition to the cases that we have hereinabove cited, the following cases support the holding that we have hereinabove made: Fetzer v. Aberdeen Clinic, 48 S.D. 308, 204 N.W. 364 (1925); State to Use of Shockey v. Washington Sanitarium and Hospital, 223 Md. 554, 165 A.2d 764 (1960); Clements v. Swedish Hospital, 252 Minn. 1, 89 N.W.2d 162 (1958); Fowler v. State, 192 Misc. 15, 78 N.Y.S.2d 860 (Ct. of Claims, N.Y., 1948); and Stansfield v. Gardner, 56 Ga.App. 634, 193 S.E. 375 (1937), which case also holds that a hospital is not an insurer of the patient's safety.

The appellant in its brief has urged 53 points of error. If correct, our rulings on appellant's first ten points of error dispose of the case and its remaining points of error become immaterial. In view of that, we will not burden this opinion with a discussion of appellant's points of error Nos. 11 through 53 inclusive.

The judgment is reversed and here rendered in favor of Harris Hospital to the effect that Mr. and Mrs. Pope take nothing by their suit for damages against Harris Hospital, and that Harris Hospital recover judgment against James L. Pope and Barbara Pope for the sum of $6,179.45.