Izora HARRIS et al., Appellants,

v.

HARRIS COUNTY HOSPITAL DISTRICT, Appellee.

No. 16881.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Oct. 6, 1977.

Rehearing Denied Nov. 10, 1977.

Jamail & Gano, John Gano, Houston, for appellants.

Joe Resweber, County Atty., Oliver J. Guiberteau, Asst. County Atty., Houston, for appellee.

EVANS, Justice.

Carlos Harris sued the Harris County Hospital District, alleging severe personal injury as a result of the District's negligence while he was hospitalized at the District's Ben Taub General Hospital. After Harris was admitted to the psychiatric ward of the hospital for observation and treatment he escaped by knocking out two plexiglass window panes in the ward's entrance doors. He ran to another wing of the hospital, climbed through an outside window to the roof, and fell three floors to the ground, injuring his back. The jury found Harris' damages to be in the amount of $100,000.00, but did not find the Hospital District was negligent in failing to maintain the plexiglass windows in such condition as would prevent Harris' escape.

Harris had the burden of establishing the negligence of the Hospital District. His four points of error raise only the questions of whether the evidence conclusively established the Hospital District's negligence and whether the jury's verdict is so against the great weight and preponderance of the evidence as to require that the cause be remanded for a new trial.

The negligence issue submitted by the court and the jury's response are as follows:

"Do you find from a preponderance of the evidence that the failure of the Hospital District to maintain the plexiglass windows in the doors to the psychiatric ward in such condition as would prevent Carlos Harris from escaping the ward, was negligence?"

"We do not."

The trial court defined the term negligence as meaning a failure on the part of the Hospital District "to use that degree of care and skill ordinarily used by a hospital of the same general type in the same or a similar community in which the hospital was located at the time in question under the same or similar circumstances."

The incident occurred on June 30, 1972. Harris, then 18 years of age, was being treated for physical ailments by a local doctor who recommended to Harris' family that Harris be taken to Ben Taub Hospital for a mental examination. On the evening prior to Harris' escape from the ward, he was taken by his family to the psychiatric section of the hospital's emergency room where he was examined by an intern and given thorazine, a drug used to calm nervous or agitated persons. Harris was then examined by the staff psychiatrist on duty who, after talking with Harris and his family for some 30 to 45 minutes, noted that Harris had "disturbances in his thought processes", and made an initial diagnosis of "acute schizophrenic reaction". She then admitted Harris to the hospital for further observation and treatment.

The psychiatric ward at Ben Taub Hospital was located on the third floor of the hospital's south wing. At the entrance to the ward were two panel doors, one of which was always maintained in a fixed position by two sliding metal rods. The other door was permitted to swing, but it was always kept locked and could only be opened with keys distributed to the doctors

and other hospital personnel authorized to enter the ward. Each door was about 3' wide and 7' high, and set in the upper half of each door was a rectangular unbreakable plexiglass window 18" × 28" in dimension. Each plexiglass window panel was held in the door frame by small strips of wooden molding. There were no steel bars or mesh across the plexiglass windows. The psychiatric ward at Ben Taub Hospital is the only locked, secured ward, other than the jail section on the top floor of the hospital. The ward was designed, constructed and operated so that patients who were placed in the ward were held in protective restraint, although their admission was voluntary and not the result of a court order. The purpose of the locked entrance doors was to keep the patients in the ward and unauthorized persons out.

The psychiatric ward was capable of holding twenty-seven mental patients at one time, and inside the ward were four seclusion rooms, each with a locking door, in which patients could be isolated. All windows within the ward were covered with a special steel mesh.

After Harris had been admitted to the ward he slept the remainder of the night in one of the unlocked seclusion rooms. The next day he stayed near the nurses station, but was returned to an unlocked seclusion room until lunch time. After lunch he returned to a seclusion room, where he remained until dinner time, and after dinner he again returned to the seclusion room.

Harris testified at the trial that on the first night of his hospitalization he had persuaded a small boy in the ward to get him a drink of water. This apparently caused another patient, who also wanted a drink of water, to become upset. The following day that patient grabbed Harris and beat his head against the wall. Harris testified this made him fearful for his own safety and made him feel that he had to get out of the ward. He ran to the entrance doors, doubled his fists and knocked out the plexiglass window. The plexiglass panel "flew out". He climbed through the opening left by the pane, ran down the hall to another wing of

the hospital where he knocked out an outside window pane and climbed through to the roof. Harris then ran across the roof, and thinking that he was being chased, lowered himself over the roof. He tried to pull himself back but could not hold on and fell three floors to the ground, fracturing his spine.

The nurse on duty on the night in question testified that between 8 and 9 o'clock she was sitting sideways from the ward entrance when she heard a crash and saw the plexiglass panel was out of the entrance door. She testified that the entire plexiglass panel had been knocked out and that the wooden molding which held the panel in place was splintered.

It was the duty of the hospital to provide for the care and protection of its patients, and in the exercise of this duty the hospital was required to provide such reasonable care as the patient's known condition required. The hospital's responsibility to its patient extended to the taking of such measures as were necessary to prevent the patient from hurting himself if the hospital knew or, in the exercise of reasonable care, should have known that the patient's mental incapacity might lead to his own injury. *Arlington Heights Sanitarium v. Deaderick*, 272 S.W. 497, (Tex.Civ.App.—San Antonio 1925, no writ); *Mounds Park Hospital v. Von Eye*, 245 F.2d 756 (8th Cir. 1957); Annot., 70 A.L.R.2d 335 (1960).

In determining whether the hospital exercised reasonable care in the instant case, it was appropriate for the jury to consider not only the physical custodial surroundings for mental patients at the hospital but also the peculiar mental traits of the patient. *Davis v. Springfield Hospital*, 204 Mo.App. 626, 218 S.W. 696 (1920). The hospital was required to guard against only those dangers which it should have anticipated from the particular circumstances at hand, and the fact alone that a patient suffered some mental incapacity would not, under every circumstance, have constituted notice to the hospital that the patient would likely harm himself unless restrained by maximum security measures. *Fetzer v. Ab-*

*erdeen Clinic*, 48 S.D. 308, 204 N.W. 364 (1925); Annot., 39 A.L.R. 1423 (1925); Gregory v. Robinson, 388 S.W.2d 88 (Mo. Sup.1960).

"The law in Texas that is applicable to and controls the disposition of this case is set out in the case of *Bornmann v. Great Southwest General Hospital, Inc.*, 453 F.2d 616 (5th Circuit, 1971) as follows at page 621: 'Simply stated, a hospital is under a duty to exercise reasonable care to safeguard the patient from any known or reasonably apprehensible danger from himself and to exercise such reasonable care for his safety as his mental and physical condition, if known, may require. Liability exists only if the suicide proximately results from the negligence of the hospital or its employees. *The most important single factor in determining the liability of a hospital for failing to prevent the suicide of a patient is whether the hospital authorities in the circumstances, could reasonably have anticipated that the patient might harm himself.'* " *Harris Hospital v. Pope*, 520 S.W.2d 813, 815 (Tex.Civ.App.—Fort Worth 1975, no writ).

In the case at bar there was testimony, in addition to that of the admitting physician, which indicated that Harris was acting irrationally and suffered some mental incapacity. One of the nurses described his condition as schizophrenic and his behavior as paranoid. She testified that he did not appear to be aware of what she was saying and that he was placed in isolation because he had become hyperactive. An orderly testified that Harris was uncommunicative and slightly catatonic and that they could tell "he was indeed a psychiatric case". Although this testimony indicates that Harris was mentally confused and needed care and treatment, the evidence does not clearly and positively establish that the hospital knew or should have known that Harris would likely take radical steps to escape from the psychiatric ward or attempt to inflict injury upon himself.

Furthermore, there was testimony from which the jury could have concluded that Harris was not considered dangerous, either by his family or the hospital personnel, and that he had not shown any violent tendencies or manifest any intent to escape. Considering the evidence in its entirety, the jury was at liberty to decide that Harris' known mental condition was not such as to indicate his potential for escape.

The authorities relied upon by the appellant are, for the most part, cases in which the trier of fact found that the hospital knew or should have known of the patient's propensity to escape or do injury to himself. The jury in the case at bar did not find from the evidence that the hospital failed to exercise ordinary care in the protection of Harris' safety, and the evidence does not conclusively establish the affirmative or that issue. Neither can this court say, from a consideration of the entire record, that the evidence so preponderates in favor of a finding of negligence on the part of the Hospital District as to require that the cause be reversed and a new trial ordered.

The judgment of the trial court is affirmed.