TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-96-00710-CV






Linda Mounts, Individually and as Independent Administratrix 


of the Estate of Alisha Dawn Mounts, Appellant



v.



St. David's Pavilion; St. David's Support Corporation d/b/a St. David's Pavilion and


St. David's Psychiatric Hospital; St. David's Hospital; St. David's Health Care


System, Inc. d/b/a St. David's Hospital and previously d/b/a St. David's


Community Hospital; and David Brown, M.D., Appellees






FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY


NO. 63,690A, HONORABLE GUY HERMAN, JUDGE PRESIDING 






 Appellant Linda Mounts sued Appellees St. David's Pavilion and others (collectively the
"Hospital") in a wrongful death and survivor suit alleging that the Hospital failed to prevent her daughter,
Alisha Mounts, from committing suicide. The trial court entered judgment on the jury's failure to find that
the Hospital negligently caused Alisha's death. Mounts filed a motion for new trial which the court denied. 
She now appeals the jury verdict as contrary to the evidence. We will affirm the trial court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND

 On October 17, 1993, Alisha Mounts was admitted to St. David's Pavilion, a psychiatric
care hospital. Upon admission, she was diagnosed as suffering from major depression, anorexia nervosa
and dissociative disorder. She was classified as a suicide risk and immediately placed on level 3 watch. (1) 
The next day she was taken off level 3 by her treating physician, Dr. Brown. Shortly after Alisha was
admitted to the Hospital, an independent psychotherapist, Barbara Grant, began private therapy sessions
with Alisha as part of her treatment. On October 22, Alisha cut her wrists with a piece of broken glass and
was placed on the highest level of suicide watch, level 4. On October 27, she was taken down to level 2
precautions where she remained until her death. During this five-day period, the staff checked on Alisha
every thirty minutes and were always available for one-on-one discussion. On the night of October 31,
Alisha visited with a friend in her room for several hours. After the visitor left, several staff members
encountered Alisha within the hour, including Larry Denton who was assigned to check on her every thirty
minutes. Alisha was last seen by a staff member around 10:45 p.m. Around 11:00 p.m., Denton knocked
on Alisha's door but received no response. Finding the bathroom door closed, he left to enlist the aid of
a female staff member. They found Alisha in the bathroom, hanging from the shower rod by a sheet which
was tied around her neck. Her feet were touching the floor and she was unconscious. Alisha died three
days later.

 Alisha's mother, Linda Mounts, brought a wrongful death and survival suit (2)
 against the
Hospital alleging that its negligence proximately caused Alisha's death. At trial, Mounts claimed that the
Hospital (1) negligently designed, constructed, installed, and maintained the shower rod in Alisha's room,
and (2) negligently assessed, monitored and cared for Alisha. The jury trial lasted over two weeks,
producing over three-thousand pages of testimony; both parties retained numerous expert witnesses. The
jury failed to find that the Hospital negligently caused Alisha's death and judgment was entered on the
verdict. Mounts now appeals the trial court's denial of her motion for a new trial claiming the jury verdict
was contrary to the overwhelming weight and preponderance of the evidence.


DISCUSSION

 Mounts's sole point of error raises a factual sufficiency question. When reviewing a jury
verdict to determine if the evidence is factually sufficient, we must consider and weigh all the evidence and
should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. See Cropper v. Caterpillar Tractor Co., 754 S.W.2d 646, 648-50 (Tex.
1988), on remand, 767 S.W.2d 813 (Tex. App.--Texarkana 1989); Pool v. Ford Motor Co., 715
S.W.2d 629, 633 (Tex. 1986). At oral argument, Mounts conceded that her appeal concerns the
negligence of the Hospital only with respect to the shower rod. Therefore, we will review the evidence
for support of the jury's failure to find that the Hospital negligently designed, constructed, installed, and
maintained the shower rod in Alisha's room and thereby proximately caused Alisha's death.

 In her cause of action, Mounts had the burden to prove that the Hospital owed a duty of
care to Alisha, that the Hospital breached its duty, and that the breach caused Alisha's death. See Doe
v. Boys Club of Greater Dallas, 907 S.W.2d 472, 477 (Tex. 1995). Neither party contests the fact that
the Hospital owed Alisha a duty of care nor that the shower rod was the cause-in-fact of her death. At
issue is whether the Hospital breached its duty of care in choosing and installing the shower rod and
whether the Hospital could have foreseen that its action or inaction with respect to the shower rod would
result in Alisha's death.


Selection and Design of the Shower Rod

 A hospital is under a duty to exercise reasonable care to safeguard the patient from any
known or reasonably apprehensible danger from herself and to exercise such reasonable care for her safety
as her mental and physical condition, if known, may require. See Harris v. Harris County Hosp. Dist.,
557 S.W.2d 353, 355 (Tex. Civ. App.--Houston [1st Dist.] 1977, no writ); Harris Hosp. v. Pope, 520
S.W.2d 813, 815 (Tex. Civ. App.--Fort. Worth 1975, writ ref'd n.r.e.). Mounts claims the Hospital was
negligent when it installed the shower rod at issue because it is the type of instrument which reasonably
presents a fatal danger to a patient in the suicide ward of a psychiatric hospital.

 The evidence regarding the installation of the shower rod consisted of testimony by
Malcolm Belisle, Nancy Townsend, and Morris Haney. At the time St. David's Pavilion was built, a
committee was formed to assist with decisions concerning construction and equipment. Belisle was the
chairman of the committee; other members included Townsend, a former administrator of a psychiatric
hospital, and Phil Bible, the architecture firm's project coordinator and a previous chief architect for the
Texas Department of Mental Health and Mental Retardation (MHMR). (3) As project coordinator, Bible
served as the liaison between regulatory agencies, the architecture firm and the Hospital to ensure that
regulatory standards were met. The committee's main task was to design the psychiatric hospital to make
it safe and functional. For example, special light screws, ventilation panels, mirrors, sink valves, shower
heads, windows, and window blinds were purchased in the interest of the patients' safety. The committee
was well aware of the potential danger a shower curtain system presents and spent substantial time
investigating its options. There were no commercially available shower curtain systems designed specifically
for psychiatric hospitals. Looking at industry practices, the committee found various systems in use. Some
hospitals used a bead system, while others used an aluminum rod with a cut in the middle, or a polyvinyl
chloride (PVC) rod without cuts. Although no specific state regulations or guidelines existed, the committee
was told that MHMR found the PVC rod acceptable. Finding other curtain systems too dangerous, the
committee selected 40 PVC pipe as a shower rod because of its flexibility. (4) Heavier pipe was rejected
because it was too inflexible, making it possible for a patient to hang herself; lighter pipe presented a
different danger--it shattered into a sharp weapon capable of inflicting injury. The 40 PVC rods were
individually shaved down at the ends to ensure they fit loosely in the holders and would pop out easily if
any weight was placed on the rod.


 Although Haney, the general manager of a PVC pipe company, testified that 40 PVC pipe
is one of the heaviest his company manufactures and that a three-foot section of that pipe could support
two hundred pounds, other witnesses stated that the 40 PVC pipe as installed in the Hospital came down
easily with very little weight. The committee tested the 40 PVC pipe installed with and without cuts in the
middle. Belisle testified that both types came down easily but that the rod with cuts was unworkable
because it came down every time the curtain was drawn. The committee decided to use the rod without
cuts. Doug Anderson, general maintenance supervisor for the psychiatric hospital, personally tested several
of the shower rods installed in Alisha's ward and found that the rods came down easily when less than a
person's weight was applied. Patricia Lyon, an inspector for the Texas Department of Health, inspected
the facilities prior to Alisha's admission. She determined that the shower rods at the Hospital would easily
pop out. The Hospital had never received any type of department citation faulting its shower systems. 
Haney stated that a shower rod could wedge into its holders if the weight hanging from the rod was "shock
loaded." (5) However, it was disputed at trial exactly how Alisha applied her weight to the shower rod. After
Alisha's death, the police tested the very rod in her room and found that it came down from its holders with
seventy-two to eighty-two pounds of weight. At the time of her death, Alisha weighed one-hundred and
fifteen pounds.

 Rather than throw the bed sheet around the middle of the rod, Alisha tied it immediately
next to the rod holder, thereby allowing the rod to support her weight. Mounts claims the Hospital should
have taken that possibility into account and that it was unreasonable to install a system which presented the
slightest danger, even from hindsight. Citing the abundant testimony regarding the Hospital's efforts to
design a safe environment, one doctor testified that it is impossible to construct a one hundred-percent safe
environment for psychiatric patients. Mounts offered no testimony to the contrary. While we are
sympathetic to Mounts's tragic loss, this Court may not impose strict liability where none exists in the law. 
A psychiatric hospital is only required to meet a reasonable standard of care in safeguarding the patient
by giving consideration to known physical or mental conditions. See Harris v. Harris County Hosp. Dist.,
557 S.W.2d 353, 355 (Tex. Civ. App.--Houston [1st Dist.] 1977, no writ); Harris Hosp. v. Pope, 520
S.W.2d 813, 815 (Tex. Civ. App.--Fort Worth 1975, writ ref'd n.r.e.). Given the conflicting testimony,
the jury could have chosen to believe that the Hospital exercised reasonable care in selecting and installing
this shower rod.


Foreseeability

 A hospital may be liable if the suicide of a patient proximately results from the negligence
of the hospital or its employees. See Pope, 520 S.W.2d at 815. An important factor is "whether the
hospital authorities in the circumstances could reasonably have anticipated that the patient might harm
[her]self." Id. Mounts contends the Hospital could have prevented Alisha's suicide by removing the rod
in response to the behavior she exhibited at the Hospital prior to her death. Five days after her admission,
Alisha told her private therapist, Barbara Grant, that she had contemplated hanging herself from the shower
rod but determined it would not hold her weight. That evening Alisha attempted suicide by cutting her
wrists with broken glass. The Hospital immediately placed her on level 4 suicide watch. She was placed
on a less restrictive watch five days later because the Hospital determined her propensity for suicide had
decreased. On the day of her suicide, Alisha spoke of suicide as a "noble and courageous thing" during
group therapy. Mounts argues this was sufficient evidence to indicate that Alisha intended to commit
suicide and the Hospital should have responded by removing the rod.

 Alisha's therapist testified that in response to her remark about hanging herself from the
shower rod, Grant informed Alisha's treating doctor and other staff members of Alisha's statement. At
trial, Grant explained why she did not direct the Hospital to remove the rod. First, the fact that Alisha
confided in Grant demonstrated a positive step evidencing Alisha's trust. Second, in the same therapy
session Alisha signed a no-harm contract, promising not to hurt herself. Grant believed Alisha's behavior
indicated a decreased possibility that Alisha would harm herself. Third, Grant determined that if she had
removed the rod Alisha would lose all confidence and trust in her therapist resulting in withdrawal by Alisha. 
Psychiatric patients, especially suicidal ones, are encouraged to reach out to others to deter any impulsive
behavior. Furthermore, a strong possibility existed that removing the rod would cause Alisha to act out in
such a way as to meet the Hospital's "expectation" that she would commit suicide. Ultimately, the
Hospital's decision to leave the shower rod in Alisha's room was a professional judgment-call it considered
reasonable under the circumstances.

 While the jury heard testimony that Alisha's behavior provided a warning to the Hospital,
it also heard testimony from a psychiatric-care specialist that Alisha's behavior was impulsive, making it
unlikely that she would formulate and announce a specific plan to commit suicide and execute it. Indeed,
after discussing the shower rod possibility with her therapist, Alisha did not pursue that plan but impulsively
cut her wrists with broken glass. Several witnesses testified that on the day of her death, even within an
hour of her death, Alisha appeared in good spirits. On the night of her death, Alisha had a visitor in her
room for several hours. He testified that Alisha asked him to mail a gift to her sister, a temporary birthday
present until she had the opportunity to pick out something better. Her friend stated that at no time during
their visit was Alisha depressed or morose and they calmly discussed whether Alisha would continue
treatment in Austin or in her hometown. He emphasized that had Alisha shown any indication in her
attitude, her demeanor or her words that she might hurt herself, he would not have left her alone. The
attending nurses and other staff on duty that night agreed that nothing in Alisha's behavior led them to
believe she might be contemplating suicide.

 In light of all the evidence, the jury could have believed that the Hospital could not have
reasonably anticipated that Alisha might harm herself when and in the manner she did. Accordingly, the
jury failed to find that the Hospital's action or inaction was the proximate cause of Alisha's death.


CONCLUSION

 Although the record contains some conflicting testimony, a jury is free to believe or
disbelieve all or any part of the evidence in making its finding. See McGalliard v. Kuhlmann, 722 S.W.2d
694, 697 (Tex. 1986). After reviewing all the evidence, we hold the jury's failure to find that the Hospital
negligently caused Alisha's death is not so contrary to the great weight and preponderance of the evidence
as to be clearly wrong and unjust. We overrule Mounts's sole point of error and affirm the trial court's
judgment.



 

 Bea Ann Smith, Justice

Before Justices Powers, Aboussie and B.A. Smith

Affirmed

Filed: December 11, 1997

Publish

1. The Hospital provides four levels of suicide precaution: Level 4 requires one-on-one observation
twenty-four hours a day with one staff member on each shift assigned to the patient; level 3 requires staff
to follow the suicide precautions checklist and maintain close observation, i.e., visual range, of the patient
during waking hours, including escorting the patient to the bathroom and checking the patient every fifteen
minutes during non-waking hours; levels 1 and 2 require staff to check the patient every thirty minutes and
are for those patients classified at least risk of suicide.
2. Alisha's father, Larry Mounts, nonsuited his entire case against all defendants.

3. Mr. Bible died before he could testify at trial. Some of his statements relevant to this lawsuit were
elicited through Mr. Belisle who worked closely with Mr. Bible on the design and construction of St.
David's Pavilion.
4. Schedule "40" denotes the size, weight, and strength of the PVC pipe.
5. "Shock loaded" means that a certain weight is hung from the rod all at once rather than reaching that
same weight incrementally.


s treating doctor and other staff members of Alisha's statement. At
trial, Grant explained why she did not direct the Hospital to remove the rod. First, the fact that Alisha
confided in Grant demonstrated a positive step evidencing Alisha's trust. Second, in the same therapy
session Alisha signed a no-harm contract, promising not to hurt herself. Grant believed Alisha's behavior
indicated a decreased possibility that Alisha would harm herself. Third, Grant determined that if she had
removed the rod Alisha would lose all confidence and trust in her therapist resulting in withdrawal by Alisha. 
Psychiatric patients, especially suicidal ones, are encouraged to reach out to others to deter any impulsive
behavior. Furthermore, a strong possibility existed that removing the rod would cause Alisha to act out in
such a way as to meet the Hospital's "e