**Teofilo PALACIOS, Maria L. Palacios, Individually and a/n/f of Gloria Janeth Palacios and Rocio Daniela Palacios, Minors, Maria Angelica Palacios, and Sentry Insurance, a Mutual Company, Appellants,**

v.

**AMERICAN TRANSITIONAL CARE CENTERS OF TEXAS, INC., d/b/a American Transitional Hospital, Appellee.**

No. 01–97–01072–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 7, 1999.

Opinion Dissenting from Overruling of Rehearing En Banc Nov. 18, 1999.

D. John Leger, Levon G. Hovnatanian, Houston, for appellants.

Steven M. Gonzalez, Wesley Nagorny, III, John C. Marshall, Houston, for appellee.

Panel consists of Justices COHEN, HEDGES, and TAFT.

## MAJORITY OPINION

MURRY B. COHEN, Justice.

Appellants ("the Palacios") appeal from an order dismissing their medical malpractice case pursuant to Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(e) (Vernon Supp. 1999) ("the Act"). We hold that the expert's report constituted a "good faith effort" to provide a "fair summary" of the Palacios' claims against appellee (the Hospital) under section 13.01(1) and (r)(6) of the Act. We further hold that the proper standard of review for this issue is not the abuse of discretion standard, as the Hospi-

1. The Palacios later nonsuited Dr. Criep. The Palacios' claims against Dr. Sanders were

tal argues, but a variant of the familiar standard used for appellate review of summary judgments. We reverse and remand.

## Factual Background and Applicable Statutory Provisions

On February 14, 1992, appellant Teofilo Palacios ("Mr.Palacios") suffered a two-story fall at work. He sustained multiple fractures and a severe brain injury. After a year of rehabilitation, he was admitted to the Hospital on March 23, 1993. The severity of his brain damage required that Mr. Palacios wear restraints while in his hospital bed. On May 14, 1994, Mr. Palacios fell from his bed to the floor. He was treated in the emergency room by John Sanders, M.D. The fall from the bed caused further brain injury and surgery.

The Palacios sued Dr. Sanders, Dr. Criep, and the Hospital.[1] He claimed the Hospital was negligent in (1) failing to instruct, train, or institute proper procedures to be used in the use of restraints on patients, (2) failing to show its employees how properly to secure the restraints used on Mr. Palacios, (3) failing properly to train and supervise its employees, (4) failing to follow physician's orders for the care of Mr. Palacios, and (5) failing properly to monitor its employees to ensure that its standards for patient care were maintained.

The Hospital moved to dismiss because the Palacios had not complied with section 13.01(d) of the Act, which states:

Not later than the later of the 180th day after the date on which a health care liability claim is filed or the last day of any extended period established under Subsection (f) or (h) of this section, the claimant shall, for each physician or health care provider against whom a claim is asserted:

severed from those against the Hospital and are still pending in the trial court.

(1) furnish to counsel for each physician or health care provider one or more expert reports, with a curriculum vitae of each expert listed in the report; or

(2) voluntarily nonsuit the action against the physician or health care provider.

TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(d) (Vernon Supp.1999). An "expert report" must provide a "fair summary" of the expert's opinions "as of the date of the report," describing the standards of care, how the defendant failed to meet them, and the harm caused by that failure. *Id.* at § 13.01(r)(6). Sanctions for failure to file an expert report include dismissal with prejudice. *Id.* at § 13.01(e). Instead of dismissing, the court granted extensions of time to file the report, and the Palacios filed on time a report by Dr. Bontke.

Following Dr. Bontke's deposition, the Hospital again moved to dismiss, contending that Dr. Bontke's report did not meet the statutory requirements for an expert report and that Dr. Bontke filed her report in bad faith because her deposition testimony showed she never held the opinion that the Hospital was negligent. Like Justice Taft, we decline to use Dr. Bontke's deposition to impeach her report. It does not do so because it does not show that the opinion expressed in her report was false when made. *See* § 13.01(r)(6).

After a hearing, the trial court granted the motion to dismiss.

## Standard of Review

■ As a general rule, the standard of review for a trial court's imposition of a sanction is abuse of discretion. *Koslow's v. Mackie,* 796 S.W.2d 700, 704 (Tex.1990). Under that lenient standard, all presumptions are taken in favor of the sanction, increasing the likelihood it will be upheld.

We do not believe that is the appropriate standard of review here, however. That standard was adopted to deal with misconduct in litigation by attorneys or parties.

This case has nothing to do with that. Article 4590i is designed to give some early assurance that a lawsuit is not "frivolous." *Horsley–Layman v. Angeles,* 968 S.W.2d 533, 537 (Tex.App.—Texarkana 1998, no pet.). It is intended to eliminate frivolous claims, similar to the way a summary judgment eliminates unmeritorious claims, by making a plaintiff produce an expert who makes "a good faith effort" to describe a breached standard of care. This threshold is lower than that of proof at trial, as shown by the fact that the report shall be deemed inadequate "only if ... the report does not constitute a good faith effort ..." to give a "fair summary" of how the standard of care was breached. *See* § 13.01(1), (r)(6).

■ We believe it proper to evaluate Dr. Bontke's report against the level of proof required of plaintiffs opposing summary judgment in medical malpractice cases. We hold that the summary judgment standard of review should be used here, not its opposite, the abuse of discretion standard. Under our new rule 166a(i), which is intended to make it easier for defendants like the Hospital to win a summary judgment, "... the [plaintiff] is not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements." *See* Comment to 1997 amendment adopting TEX.R. CIV. P. 166a(i). We doubt that a plaintiff must produce more proof now, at this preliminary stage, than he would have to produce in responding to a motion for summary judgment. Consequently, we decline to protect dismissals under section 13.01(e) with a standard of review less stringent than that for summary judgments.

## Dismissal

In points of error one and two, the Palacios contend: (1) if the trial court dis-

missed the case under section 13.01(e), it erred because they fully complied with the requirements of section 13.01(d) and (2) if the trial court dismissed under 13.01(1), it erred because section 13.01(1) requires only a good faith effort to file an adequate report, and he made one.[2]

We read both sections 13.01(e) and 13.01(1) as applying to a trial court's dismissal of a medical malpractice suit for failure to comply with the requirements in providing an expert report. Section 13.01(1) provides:

> A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent *a good faith effort to comply with the definition of an expert report* in Subsection (r)(6) of this section.

(Emphasis added.) Thus, the issue is whether the Palacios made a good faith effort to file an "expert report," as defined in subsection (r)(6). We address the Palacios' first two points together.

### Did the Palacios Make a Good Faith Effort to Provide an Expert Report?

The Hospital contends Dr. Bontke's report did not provide a "fair summary" of her opinions concerning the standard of care, nor did it show how the Hospital failed to meet the standard of care, as required by subsection (r)(6). The Palacios rely on the following portions of Dr. Bontke's report:

> Based on the available documentation I was able to conclude that: Mr. Palacios fell from his bed on 5/14/94 while trying to get out of it on his own. The nursing notes document that he was observed by nursing on the hour for two hours prior

to the fall. In addition, ten minutes before the fall, the nursing notes documents [sic] that his wrist/vest restraint[s] were on. Yet, at the time of his fall he was found on the floor with his vest/wrist restraints on but not tied to the bed. It is unclear how he could untie all four of the restraints from the bedframe in under ten minutes. **Obviously, Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized.**

. . .

> All in all, Mr. Palacios sustained a second brain injury with a left subdural hematoma while he was an inpatient at [the Hospital]. . . . **In my opinion, the medical care rendered to Mr. Palacios at the time of his second brain injury was below the accepted and expected standard of care which he could expect to receive. Moreover, this conduct below the accepted standard of care extends to both the cause of the second injury as well as the subsequent treatment. . . .**

(Emphasis added.)

The Hospital first contends that these statements do not distinguish the different standards that would apply to each of the health care providers sued. We disagree. When he fell, Mr. Palacios was the Hospital's patient, in its bed, using its restraints, attended by its nurses, who knew he was trying to escape his restraints and knew this posed an imminent danger. Thus, we have no difficulty concluding that Dr. Bontke's criticism for failing to restrain Mr. Palacios adequately was directed at the Hospital. *See Harris v. Harris County Hosp. Dist.*, 557 S.W.2d

---

**2.** The Hospital sought sanctions pursuant to section 13.01 only, and not independently of it. Therefore, we will consider only the Palacios' arguments relating to section 13.01.

We decline to address point of error three, which attacks the sanction as a response to misconduct in litigation.

353, 355 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ).

■ Nor do we believe Dr. Bontke's statements were too conclusory to give a fair summary of how the standard of care was breached. The record shows that, on May 14, 1994, at 8:20 p.m., Mr. Palacios was checked by the Hospital's nurse. He had his wrist restraints on, but was trying to undo them, and, according to the Hospital's records, the nurse tightened them at that time. Nevertheless, within ten minutes, by 8:30 p.m., Mr. Palacios, still wearing his wrist restraints, fell to the floor. His wrist restraints were not tied to the bed when he was found. Dr. Bontke opined:

> It is unclear how he could untie all four of the restraints from the bed frame in under ten minutes. Obviously, Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized.

Just as in reviewing a summary judgment, we will grant to the nonmovants, the Palacios, all reasonable inferences from this language. The following inferences are reasonable. First, based on the statement that it is unclear how Mr. Palacios could untie all four restraints in under ten minutes, it is reasonable to infer that Dr. Bontke believed that a person as disabled as Mr. Palacios could not, in fact, untie them in fewer than ten minutes; therefore, the only possible explanation for his escape would be that the restraints were not properly tied to the bed.

Second, Dr. Bontke's report relies on the Hospital's own records to show that,

ten minutes before he was found injured on the floor, Mr. Palacios "was awake and alert and appeared to be trying to remove his restraints." This shows the Hospital knew of the present, not merely potential, risk to Mr. Palacios and should have taken, as Dr. Bontke stated in her report, "precautions to prevent his fall. . . ."

Third, Dr. Bontke's report, again relying on the Hospital's own records, states that the Hospital at 8:20 p.m. did recognize the risk and did take some precautions. The report says, "The restraints were tightened to the bed frame and a Spanish-speaking nurse told him not to loosen his restraints and to call if he needed help." With such precautions allegedly having been taken at 8:20 p.m., Dr. Bontke could not envision how Mr. Palacios could have escaped so fast. A reasonable inference from that would be that the Hospital's records were false, *i.e.*, contrary to the Hospital's record, the restraints were not tightened at 8:20 p.m., although they should have been.[3] Thus, Dr. Bontke's report provided a "fair summary" of what the Hospital did wrong.

■ But the controlling issue is not whether the report provided the requisite "fair summary." Rather, the controlling issue is stated in section 13.01(1): whether Dr. Bontke's report "does not represent *a good faith effort to comply* with the definition of an expert report in subsection (r)(6) of this section." § 13.01(1) (emphasis added).

■ Section 13.01(1) favors the plaintiff. It means that, before a report is deemed inadequate, it must do more than fail to

---

**3.** In her deposition, Dr. Bontke stated this expressly: "I have a question in my mind whether is was documented exactly as it happened." She repeatedly stated she had not seen all the hospital records she need to see and stated, "I'm still in question as to whether this nurse really felt—really believed that she had tightened those four restraints to get them off in ten minutes. But given the infor-

mation as presented and the way it's documented, I can't say for sure" that appellee was negligent. Expressing her skepticism about the truth of the nurse's report, she stated, "It's more likely that they weren't tied properly or that he was in the habit of untying them and somebody didn't know that they were tied in the wrong place. Something's amiss here. It just doesn't all fit."

constitute a "fair summary." Rather, it must fail even to "represent a good faith effort to comply" with the requirement of a "fair summary." Many reports that may arguably fail to provide a fair summary will nonetheless comply with section 13.01(1) by constituting a good faith effort to do so. This is such a case.

We have been directed to only two cases in which courts held that an expert's report failed to provide a "fair summary" under section 13.01(r)(6). Neither is controlling, however, because these reports were much more deficient than this one, and, in addition, neither case applied the "good faith effort" standard of section 13.01(1). *See Wood v. Tice,* 988 S.W.2d 829, 831–32 (Tex.App.—San Antonio 1999, pet. denied) (Plaintiff never filed an expert report but instead relied on deposition testimony that failed to mention any of several defendants by name or state how they breached the standard of care, failed to demonstrate both causation and damages, and failed to include the expert's curriculum vitae); *Horsley–Layman,* 968 S.W.2d at 535–36 (the report was filed months late and never mentioned Dr. Angeles). In this case, the Palacios timely filed a much better report than those in *Wood* and *Horsley–Layman.* Moreover, even if the report were not a "fair summary," it represented "a good faith effort to comply with the definition of an expert report in subsection(r)(6) of this section." Thus, it met the requirement of article 4590i, section 13.01(1).

Consequently, we sustain the Palacios' first two points, reverse the judgment, and remand the cause.

### Justice TAFT dissenting.

1. While we are not bound by the Palacios' choice of the appropriate standard of review, the Palacios adopt the standard employed by the only other case reviewing the issue. *See Wood v. Tice,* 988 S.W.2d 829, 830 (Tex. App.—San Antonio 1999, pet. denied).

TAFT, Justice, dissenting.

The Palacios present issues challenging the trial court's dismissal of a medical malpractice action by utilizing an abuse-of-discretion standard of review of a trial court's imposition of sanctions.[1] Whether the issue is failure to make a good faith effort to comply, or the failure to provide a fair summary, and regardless of which standard of review is used,[2] I would hold that the trial court did not err in dismissing the case. Accordingly, I respectfully dissent.

### Did Expert Report Provide Fair Summary of Standard of Care and Failure to Meet that Standard?

The Hospital contends Dr. Bontke's report did not provide a "fair summary" of her opinions concerning the applicable standard of care, nor how the Hospital failed to meet that standard, as required by subsection (r)(6) of article 4590i of the Medical Liability and Insurance Improvement Act. *See* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(r)(6) (Vernon Supp.1999). The Palacios respond by referring us to the following portions of a letter from Dr. Bontke to counsel for the Palacios:

> Based on the available documentation I was able to conclude that: Mr. Palacios fell from his bed on 5/14/94 while trying to get out of it on his own. The nursing notes document that he was observed by nursing on the hour for two hours prior to the fall. In addition, ten minutes before the fall, the nursing notes documents [sic] that his wrist/vest restraint were [sic] on. Yet, at the time of his fall he was found on the floor with his vest/wrist restraints on but not tied to the

2. The Majority Opinion sees the trial court's dismissal as determining only the merits of the lawsuit. But it is also possible that a plaintiff's disregard of the procedure might be considered in assessing the sanction of dismissal. *See* TEX.REV.CIV. STAT. ANN. art. 4590i(e) (Vernon Supp.1999).

bed. It is unclear how he could untie all four of the restraints from the bedframe in under ten minutes. **Obviously, Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized.**

. . .

All in all, Mr. Palacios sustained a second brain injury with a left subdural hematoma while he was an inpatient at [the Hospital]. . . . **In my opinion, the medical care rendered to Mr. Palacios at the time of his second brain injury was below the accepted and expected standard of care which he could expect to receive. Moreover, this below the accepted standard of care extends to both the cause of the second injury as well as the subsequent treatment** . . . .

(Emphasis added). The Hospital contends these statements are conclusory and do not distinguish the different standards that would apply to each of the health care providers sued. However, subsection (r)(6) requires only that an expert report provide a "fair summary" of the expert's opinion regarding the applicable standard of care and how that standard was breached. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(r)(6).

Determining what constitutes a "fair summary" of the applicable standard of care, and how the standard was breached under section 13.01(r)(6) of article 4590i, appears to present a question of first impression. *See Wood*, 988 S.W.2d at 831–32 (analyzing closely similar issues). I would begin by examining precedents that describe what constitutes a statement of the applicable standard of care and how the standard is breached.

A standard of care for medical malpractice is the mode or form of treatment that a reasonable and prudent member of the medical profession would undertake. *White v. Wah*, 789 S.W.2d 312, 317 (Tex. App.—Houston [1st Dist.] 1990, no writ). One of our prior cases provides an example of a statement of a standard of care:

Based upon the qualifications described above, I am familiar with the standard of care and treatment of the patient with injuries and medical problems faced by the patient in question. That standard of care requires that the physician examine the patient, evaluate her medical condition, and treat the injury, prescribe medication if necessary, and refer the patient for follow-up treatment if necessary.

*Armbruster v. Memorial Southwest Hosp.*, 857 S.W.2d 938, 943 (Tex.App.—Houston [1st Dist.] 1993, no writ).

A breach of a standard of care arises in relation to the standard required. For example, failure to prescribe necessary medication would constitute a breach of the standard stated in *Armbruster*. When the health-care provider is a hospital, the standard of care would conform to the reasonable and prudent mode of hospital care. Failure to follow the reasonable and prudent mode of hospital care would constitute a breach of the hospital's standard of care.

Here, Dr. Bontke stated that Mr. Palacios had a habit of trying to undo his restraints, and precautions to prevent his fall were not properly utilized. She also stated the medical care rendered to Mr. Palacios was below the accepted standard of care. Dr. Bontke did not, however, state what precautions constituted the standard of care, nor how the Hospital could have complied with the accepted standard of care. It follows that she did not specify the manner in which the Hospital did not utilize precautions. The Palacios argue that a logical inference from Dr. Bontke's report is that Mr. Palacios's restraints

were not properly tied to the bed. The Palacios further contend the implicit standard of care was thus to have tied the restraints to the bed properly, and that failure to tie the restraints properly constitutes the breach.

While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. In this case, I would expect a statement something like either of the following: "the applicable standard of care required the Hospital to check on the patient every five minutes, and the Hospital did not do so"; or "the applicable standard of care required the Hospital to secure the restraints with adhesive tape over the ties, but the Hospital did not do so."

I agree with the Hospital that Dr. Bontke's statement was conclusory. The statement amounted to no more than stating the health care provider did not take sufficient precautions to avoid the injury to the patient. Accordingly, Dr. Bontke's statement did not provide a basis for the trial court to conclude with confidence that the Palacios' medical malpractice suit had any substance. *See Wood,* 988 S.W.2d at 830; *Horsley–Layman v. Angeles,* 968 S.W.2d 533, 537 (Tex.App.—Texarkana 1998, no pet.) (explaining that purpose of article 4590i is to curtail frivolous claims against physicians and health care providers).

That Dr. Bontke's report is conclusory is supported by the lack of any basis for her conclusion that "[Mr.] Palacios obviously was in the habit of trying to undo his restraints." Furthermore, the report does not indicate what procedures should have been taken to restrain a regular patient, much less one who habitually tries to undo his restraints, such as using more secure restraints or checking the patient more frequently. It follows that the report does not state how the hospital failed to utilize such procedures. It is also noteworthy that Dr. Bontke's report indicates that even though Mr. Palacios was scheduled only for hourly checks, on the hour, a nurse checked on him at 20 minutes after the hour. Finding Mr. Palacios trying to undo his restraints, the nurse tightened the restraints to the bed frame and brought in a Spanish-speaking nurse to admonish Mr. Palacios not to loosen his restraints, but to call for help when needed. This conduct demonstrates extraordinary care taken just 10 minutes before Mr. Palacios was found on the floor, having fallen out of his bed.

I agree with the Palacios that we cannot consider Dr. Bontke's deposition testimony, given months after her report, in evaluating whether her report constituted a fair summary for purposes of section 13.01(r)(6). While rejecting the testimony for that purpose, it is still noteworthy because it shows that Dr. Bontke could not, even at the time of her deposition, state any precautions the Hospital could have taken to prevent Mr. Palacios's fall out of bed.

I would conclude the trial court would not have abused its discretion in finding Dr. Bontke's report did not contain a fair summary of the applicable standard of care and its breach.

### Did Expert Report Constitute a Good Faith Effort to Provide Fair Summary of Standard of Care and Failure to Meet that Standard?

What the Palacios rely on as an expert report in this case is, from its face, a letter from Dr. Bontke to counsel for the Palacios explaining what went wrong in the Hospital's care of Mr. Palacios. There is no reference to expert reports or subsection (r)(6) of section 13.01(*l* ) of article 4590i. There is no attempt to comply with the requirements of an expert report by setting out the standard of care and its breach. The Palacios sought to make a silk purse (expert report) out of a sow's ear (physician's letter to counsel).

Accordingly, whether the issue was the Palacios' failure to make a good faith effort to comply with the requirement of provid-

ing an expert report, or whether it was the Palacios' failure to provide an expert report, I would hold that the Palacios failed to do so as a matter of law, so that it does not matter which standard of review is used. Therefore, I would overrule the Palacios' first two points of error.

## Conclusion

I would affirm the trial court's order dismissing the case.

MICHAEL H. SCHNEIDER, Chief Justice, dissenting on overruling of motion for rehearing en banc.

I respectfully dissent from the overruling of appellee's motion for rehearing en banc. I agree with and would join Justice Taft's dissenting opinion, but I write separately to emphasize that the standard of review should be abuse of discretion, rather than that for summary judgment. Not only have other courts reviewed dismissals under section 13.01 of article 4590i for abuse of discretion,[1] but, I conclude, the plain language of subsection 13.01($l$) also requires such review: "A court shall grant a motion challenging the adequacy of an expert report only if it appears to the Court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in Subsection(r)(6) of this section." Tex.Rev. Civ. Stat. Ann. art. 4590i, § 13.01($l$) (Vernon Supp.1999) (emphasis added). I would follow that plain language and apply an abuse-of-discretion standard here. Michael H. Schneider Chief Justice

A majority of the Justices voted to overrule the motion for rehearing en banc.

Justice TAFT joins Chief Justice SCHNEIDER'S dissent from the overruling of rehearing en banc.

---

1. *Tibbetts v. Gagliardi,* No. 14–98–00843–CV, slip op. at 6, 2 S.W.3d 659, 663 (Tex.App.—Houston [14th Dist.] Sept.9, 1999, no pet. h.); *Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 730, (Tex.App.—San Antonio 1999, no pet. h.); *Martinez v. Lakshmikanth,* 1 S.W.3d 144, 146 (Tex.App.—Corpus Christi 1999, no pet. h.); *Presbyterian Healthcare Sys. v. Afangideh,* 993 S.W.2d 319, 323 (Tex.App.—Eastland 1999, pet. denied); *Wood v. Tice,* 988 S.W.2d 829, 832 (Tex.App.—San Antonio 1999, pet. denied); *Estrello v. Elboar,* 965 S.W.2d 754, 758 (Tex.App.—Fort Worth 1998, no pet.); *see also Nguyen v. Kim,* 3 S.W.3d 146, 151 (Tex.App.—Houston [14th Dist.] 1999, no pet. h.) (denial of motion to extend time to file expert report); *Roberts v. Medical City Dallas Hosp.,* 988 S.W.2d 398, 402 (Tex. App.—Texarkana 1998, pet. denied) (same); *Horsley–Layman v. Angeles,* 968 S.W.2d 533, 536–37 (Tex.App.—Texarkana 1998, no pet.) (same).